## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## Louisville, Kentucky

*ELECTRONICALLY FILED*

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, EX REL. ATTORNEY GENERAL, JACK CONWAY,<br><br>*Plaintiff,*<br><br>v.<br><br>MARATHON PETROLEUM COMPANY, LP,<br><br>*Defendant.* | Case No.  3:15-cv-354-DJH<br><br><br>**COMPLAINT WITH JURY TRIAL DEMANDED** |

## COMPLAINT

Comes the Plaintiff, Commonwealth of Kentucky *ex rel.* Attorney General Jack Conway, and brings this cause of action for violation of the Sherman Act, the Clayton Act, and the Kentucky Consumer Protection Act, and seeks injunctive relief, civil penalties, and punitive damages against the Defendant, Marathon Petroleum Company, LP ("MPC" or "Marathon"):

### INTRODUCTION

1.      Gasoline is an integral part of the Kentucky economy, powering all types of family and commercial automobiles that make the state economy function.  In 2011, the last year for which independent data is publicly available, approximately 794,400 gallons of gasoline were sold at retail each day in Kentucky.[1]

2.      For many years, Kentucky residents and resident businesses purchasing gasoline as a necessary good have endured elevated and unpredictable prices at retail locations around the

---

[1] U.S. Energy Information Administration, Independent Statistics & Analysis, Refiner Motor Gasoline Sales Volumes, *Sales to End Users Through Retail Outlets, Total*, found at http://www.eia.gov/dnav/pet/pet_cons_refmg_c_SKY_EPM0_mgalpd_a.htm

state.  As a recent example, on May 7, 2015 the average retail price for a gallon of gasoline was $2.75 in Louisville, Kentucky; $2.69 in Covington, Kentucky; and $2.45 in Simpsonville, Kentucky.  By way of further example, independent pricing data indicates that in the early summer of 2014, Louisville consumers of retail gasoline paid almost $.50 more per gallon of unbranded gasoline than similarly situated St. Louis consumers, with St. Louis being a comparable market with similar grade requirements.  Many in Kentucky have wondered why our retail gasoline prices seem so often irrationally disconnected from those of our border states, frequently resulting in Kentucky citizens paying more to get to work and take their children to school than similarly situated individuals residing outside the Commonwealth.  The answer appears in the unlawful, anticompetitive business activities engaged in by Marathon, as outlined in this Complaint.

3.      Marathon is the largest supplier of gasoline in the Commonwealth of Kentucky, and largest supplier of Reformulated Gasoline ("RFG") in the Louisville and Northern Kentucky markets.  On information and belief, Marathon has an approximate wholesale market share of 90 to 95 percent.  Marathon maintains and/or attempts to maintain this market dominance through the combined use of deed restrictions on real property at the retail level which limit the number of retail gasoline locations in the state and, in some instances, require that only Marathon gasoline be sold by the property purchaser; through anticompetitive supply arrangements with independent retail sellers of gasoline; and through manipulation of the market for RFG in Louisville and Northern Kentucky between May 1 and September 15 of each calendar year through exchange agreements with its competitors: other major refiners of gasoline.

4.      The deed restrictions constitute *per se* anticompetitive conduct intended to restrict real property owners from participating in the retail market for gasoline as sellers of motor fuels or as

owners of retail gas stations or convenience stores, the latter of which is inextricably linked to the sale of gasoline throughout the Commonwealth.  Some deed restrictions further restrict competition by requiring the purchaser to sell only Marathon petroleum products.   This conduct deprives consumers of an increase in the number of retail gasoline stations selling competitively-priced gasoline, suppresses unbranded or other branded retailers as a competitive force throughout Kentucky, and illegally restricts a potential seller of motor fuels from choosing a supplier other than Marathon.

5.      Marathon has required certain independent retail sellers of gasoline to execute anticompetitive supply arrangements that, on information and belief, limit the retailers' ability to obtain gasoline from Marathon's competitors and bind the retailers to adhere to stated volumetric purchases from Marathon subject to penalty.  Furthermore, these supply agreements require retailers to waive their right to claim that Marathon's pricing is unfair or anticompetitive.  These supply agreements are *per se* anticompetitive.

6.      Marathon's dominant market power has allowed it to illegally manipulate and/or attempt to manipulate the market for RFG in the Louisville and Northern Kentucky markets.  Marathon is the largest supplier of wholesale compliant RFG to the Louisville and Northern Kentucky areas.  Marathon executes exchange agreements with its horizontal competitors that have the effect of 1) dividing or allocating production and 2) reducing the motivation for competitors to enter the Louisville and Northern Kentucky markets to supply RFG.

7.      Plaintiff Commonwealth of Kentucky, ex rel. Attorney General Jack Conway, brings this complaint to prevent Marathon from continuing to engage or attempting to engage in anticompetitive conduct including: requiring deed restrictions on certain parcels of real property sold by Marathon or any of its subsidiaries; entering into supply agreements that unreasonably

restrict the ability of gasoline retailers to purchase supply from competitors; requiring wholesale unbranded customers to waive their rights to rectify violations of the antitrust and consumer protection laws by Marathon; and manipulating the market for RFG in Louisville and Northern Kentucky through the use of exchange agreements that dis-incentivize Marathon's horizontal competitors from entering these markets and allow Marathon to raise prices above or reduce output, service and innovation below what would likely prevail in the absence of these agreements.

8.      This action is filed by Attorney General Jack Conway under the provisions of the Kentucky Consumer Protection Act, the Sherman Act, and the Clayton Act, as *parens patriae* on behalf of the citizens, general welfare, and economy of the Commonwealth of Kentucky.  For the injuries that Plaintiff has sustained and continues to sustain a result of Marathon's violation of those laws, the Commonwealth seeks consideration given, damages, restitution, treble damages or three times consideration given by consumers of reformulated gasoline sold in Louisville and Northern Kentucky, disgorgement, other monetary relief, injunctive and other equitable relief under federal antitrust laws and the Commonwealth of Kentucky's antitrust, consumer protection, unfair trade practices, and unjust enrichment laws, as well as costs of suit, including reasonable attorneys' fees.

9.      By incorporating deed restrictions on the permissible use of real property, by entering into supply agreements with retailers that limit choice and constrain competition, and by entering into exchange agreements with horizontal competitors that limit the supply of RFG in the relevant product market, Marathon has violated and continues to violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, and KRS 367.170(1) & 367.175(1)-(2).

**JURISDICTION & VENUE**

10.     This Court has subject matter jurisdiction over this action under 15 U.S.C. §§ 4, 26, and 28 U.S.C. §§ 1331, 1337, because this case arises under federal statutes protecting trade and commerce against restraints and monopolies, seeking to prevent, restrain, and enjoin violations of federal antitrust laws.  Marathon is engaged in interstate commerce and in activities substantially affecting interstate commerce.  Marathon supplies gasoline throughout the United States and is engaged in a regular, continuous, and substantial flow of interstate commerce, and its distribution business has had a substantial effect upon interstate commerce.

11.     This Court has jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

12.     This Court has personal jurisdiction over Marathon, because it transacts business and is found within the Western District of Kentucky.

13.     Venue is proper in the Western District of Kentucky, under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)(d).

**PARTIES**

14.     Plaintiff Jack Conway, as the duly elected Attorney General of the Commonwealth of Kentucky, is responsible for the enforcement and administration of Kentucky law, including but not limited to the Consumer Protection laws set forth in Chapter 367 of the Kentucky Revised Statutes.  The Attorney General is authorized to bring this action under KRS 367.190, 367.990, the Hart-Scott-Rodino Act, 15 U.S.C. § 15c, which permits states' attorney generals to bring

*parens patriae* suits on behalf of those injured in violation of the Sherman Act and Section 16 of the Clayton Act, 15 U.S.C. § 26 .

15.     Defendant Marathon Petroleum Company, LP, is a Delaware Limited Liability Company registered to do business in Kentucky.  It is engaged in the business of petroleum refining and marketing and lists a principal office address in Findley, Ohio, on its registration filings with the Kentucky Secretary of State.  On January 1, 1998, Marathon signed a definitive joint venture agreement with Ashland, Incorporated.  That agreement consummated into a merger in 2004 into Marathon Ashland Petroleum (MAP). MAP subsequently divided into two companies, Marathon Petroleum Corporation, which is the successor to MAP's refining, transportation and marketing, and Marathon Oil Corp, which took over Marathon's crude oil exploration and production. Marathon Petroleum Corporation, together with its subsidiaries, is one of the largest petroleum product refiners, marketers and transporters in the United States. MPC's refining, marketing and transportation operations are concentrated primarily in the Midwest, Gulf Coast and Southeast. Marathon brand gasoline is sold through approximately 5,000 independently owned retail outlets across 17 states, including at 144 Speedway stations owned by MPC in Kentucky, as well as 586 independently owned Marathon brand stations in the Commonwealth.[2]

## DEFINITIONS

16.     "RFG" is an acronym for reformulated gasoline which was mandated by the 1990 amendments to the Clean Air Act.

17.     "Refinery" is a facility that separates crude oil into products such as gasoline, fuel oil, lubricants, and kerosene.

---

[2] http://www.marathonpetroleum.com/content/documents/investor_center/annual_reports/2014_MPC_Annual_Report_and_10-K.pdf at p. 18.

18.     "Retailer" is a firm (other than a refiner or reseller) that carries on the trade or business of purchasing refined petroleum products and reselling them to consumers at service stations.

19.     "Rack price" is the price paid at a refiner's wholesale distribution facility known as "the rack."  Typically, there are different rack prices for branded gasoline and unbranded gasoline.

20.     "Spot market" is a market for short-term bulk gasoline purchases.

21.     "Exchange agreement" is a contract between two refiners by which the two companies trade gasoline, including but not limited to reciprocal buy-sell agreements.

22.     "Relevant time period" is the time period from January 1, 1998, to the present.

23.     "VOC standard product" is that specific formulation of RFG that is compliant to the Louisville and Northern Kentucky gasoline markets from May 1 to September 15 in any given calendar year.

24.     "Person" is any individual, partnership, corporation, association, firm, or other legal entity.

## FACTS

### I.   Marathon Uses Deed Restrictions on Real Property to Limit Competition at the Retail Level.

25.     During the relevant time period, Marathon possessed or attempted to possess a monopoly over the sale of conventional and VOC standard product gasoline in Kentucky.

26.     Marathon has willfully acquired or maintained that power, or attempted to willfully acquire or maintain that power, through the use of deed restrictions.

27.     Upon information and belief, during the relevant time period, Marathon sold real property parcels throughout Kentucky that once maintained retail gasoline operations with deed restrictions that prohibited future gasoline sales and other conduct related to the sale of gasoline,

*e.g.*, the operation of a convenience store.  Marathon specifically sold real property parcels in, at least, Fayette County and Jefferson County containing deed restrictions similar to the following:

> [Grantee] agrees that for a period of twenty-five (25) years from and after the date of this conveyance the Property shall not be used for a convenience store or for the sale, marketing, storage or advertising of petroleum fuels or motor oils, and that this restriction shall be a covenant running with the land and shall be contained in and made of part of every deed, mortgage, lease or other instruction affecting title to the Property.[3]

28.     Upon information and belief, during the relevant time period, Marathon sold real property parcels in Kentucky that once maintained retail gasoline operations with deed restrictions that prohibited future gasoline sales and other conduct related to the sale of gasoline, *e.g.*, the operation of a convenience store, with the sole exception that motor fuels could be sold if they were:

> [T]he trademarked products of MARATHON PETROLEUM COMPANY LLC, its successors and assigns, or from a MARATHON branded Jobber and that the restriction shall be a covenant running with the land and shall be contained in and made a part of every deed, mortgage, lease or other instrument affecting the title to the premises.[4]

29.     Marathon's own corporate website unabashedly advertises its use of these deed restrictions.  On a section of its corporate website titled "Real Estate," Marathon claims: "Marathon Petroleum Corporation (MPC) and its subsidiary companies, which include Speedway LLC, have approximately 280 properties for sale. These surplus properties are located in 13 states throughout the Midwest and Southeast."  Marathon's corporate website continues, "Note most properties are subject to a possible 25-year petroleum deed restriction."  When a viewer clicks on the "deed restriction" hyperlink, he or she is brought to text that reads:

> Most properties are offered for sale subject to a deed restriction prohibiting the sale of petroleum and tobacco products or operation of a convenience store for 25 years. A

---

[3] *See* Exhibit A. January 31, 2013 Deed between Speedway, LLC, a Delaware Limited Liability Company f/k/a Speedway Super America, LLC, and Schleicher Holdings LLC.
[4] *See* Exhibit B.  December 18, 2007 Special Warranty Deed between Speedway SuperAmerica LLC and Sav-A-Step Real Estate Inc.

typical deed restriction states that, "Grantee agrees that for a period of twenty-five (25) years from and after the date of this conveyance, the premises shall not be used for a convenience store or for the sale, marketing, storage or advertising of petroleum fuels, motor oils or tobacco products, and that this restriction shall be a covenant running with the land and shall be contained in and made a part of every deed, mortgage, lease or other instrument affecting the title to said premises."[5]

30.     These aforementioned deed restrictions represent contracts in restraint of trade.  They effect a restraint *per se.*

31.     The deed restrictions produced adverse, anticompetitive effects within the retail gasoline market by reducing the amount of suitable properties favorably located for competing retail gasoline stations in Kentucky for the retail sale of gasoline.

32.     The deed restrictions are inherently anticompetitive.  They artificially restrain the number of retail gasoline stations, suppressing and eliminating unbranded or other branded marketers as a competitive force in the relevant geographic market.

33.     Marathon imposed the deed restrictions with the intent and purpose of limiting the retail gasoline market and/or keeping other branded and unbranded gasoline out of that market for its own gain.

34.     As a result of these deed restrictions, Kentucky consumers have endured inflated gasoline prices during the relevant time period.

35.     Marathon's practice of including the deed restrictions discussed above in sales of retail gasoline stations is unfair and unconscionable.

36.     The deed restrictions at issue did not, nor were they intended to, serve any legitimate procompetitive purpose.

---

[5] *See* http://www.marathonpetroleum.com/Operations/Refining_and_Marketing/Marketing/Real_Estate/

## II.   Marathon Uses Anticompetitive Contractual Agreements to Maintain or Attempt to Maintain Market Power to the Detriment of Kentucky's Gasoline Purchasers.

### a.   Supply Agreements with Retailers Constrain Choice of Supplier.

37.     Kentucky consumers buy gasoline at retail stations throughout the state. Retail stations sell either branded or unbranded gasoline, and are referred to as branded or unbranded stations. Consumers' purchasing behavior can be generally characterized as motivated by brand loyalty or by price, among other factors. Unbranded stations generally market to consumers who are seeking the lowest price gasoline, rather than a particular brand. Under normal circumstances, unbranded stations generally have somewhat lower prices. Because some brand-oriented consumers will substitute lower priced unbranded gasoline if the price difference between branded and unbranded becomes too great, unbranded gasoline is important to keep retail pricing competitive.  Unbranded retailers thus provide a competitive check on the pricing behavior of branded retailers.

38.     Unbranded stations purchase gasoline from Marathon and other wholesalers through supply agreements that can set prices based on formula (usually based on a reference spot market price) or based on a "rack price" which is controlled solely by the wholesale seller that posts that rack price.

39.     The wholesale market has complexities that lead to retailers having different cost structures, depending on whether they are branded or unbranded, have long-term contracts or pay the Rack Price.   In Kentucky, MPC's wholesale market dominance and anticompetitive actions have resulted in supracompetitive prices for wholesale gasoline.

40.     ██████ and █████ are unbranded retailers who have been among the largest purchasers of RFG from Marathon in the Louisville area. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████

41.     As a refiner (and the dominant refiner supplying RFG to Louisville and Northern Kentucky) MPC controls many factors that influence supply of that product. In addition to the provisions cited above, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████

42.     On its face, the preceding provision appears to be a deliberate attempt by MPC to maintain its monopoly market power by preventing challenges to potentially anticompetitive practices by those who are harmed by them—the same retailers who depend on Marathon for supply, and who would face substantial penalties for switching to another supplier, if such were available.

43.     MPC has used its market power as the dominant supplier of unbranded gasoline to impose these anti-competitive provisions on independent wholesale customers.

44.     Through these actions, Marathon has injured competition and caused consumer harm by its actions in entering into supply agreements that are intended to maintain its monopoly power.

In summer 2014, Louisville RFG consumers paid on average 17.3 cents per gallon more than their counterparts in St. Louis.

> ### b. Exchange Agreements with Horizontal Competitors Keep Other Potential RFG Suppliers Out of Kentucky and Allow Marathon to Manipulate or Attempt to Manipulate Pricing in the RFG Market in Louisville and Northern Kentucky.

45.     In 1990, the Clean Air Act was amended to prescribe specific requirements to sell RFG in explicitly identified states and cities not attaining a previously establish air quality target.  States and regions not required to participate were permitted to opt into the program.

46.     The RFG program aims to reduce ground-level ozone-forming pollutants and combat carbon emissions.  The RFG regulations set content criteria and emissions-based performance standards for refiners.

47.     While no city in Kentucky was required to use RFG by these Amendments, the governor of Kentucky voluntarily opted-into the program, on January 1, 1995, under Section 211(k)(6)(A) of the Clean Air Act.  This opt-in now requires retailers to sell a particular type of RFG in: Boone County, Campbell County, Jefferson County, Kenton County, and portions of Bullitt and Oldham Counties (hereinafter referred to as "Louisville and Northern Kentucky").  Outside of Louisville and Northern Kentucky, retailers are permitted to sell conventional gasoline.

48.     The RFG program implements a volatile organic compound (VOC) control period during the summer, generally effective May 1 through September 15 at all facilities.

49.     For Louisville and Northern Kentucky, the summer VOC control period *requires* that RFG have a VOC standard emission reduction of 23.4%.  This establishes the Relevant Product Market for purposes of the Clayton Act.

50.     Other methods of powering motor vehicles or equipment are not in the same market as VOC standard products, because those methods do not comply with the EPA regulations, are less

convenient, are more cumbersome, or are too expensive.  For instance, the summer standard for Chicago or Milwaukee RFG blended with 10% ethanol is a minimum VOC emission reduction of 21.4% and is considered Region 2 "Adjusted VOC gasoline."  This "Adjusted VOC gasoline," is less stringent than the VOC standard products for Louisville and Northern Kentucky.  For this reason, Adjusted VOC gasoline sold in Chicago and Milwaukee is not sold into the Louisville and Northern Kentucky markets.[6]

51.     The relevant geographic market for the claims related to RFG gasoline is Louisville and Northern Kentucky. Louisville and Northern Kentucky is the geographic area of competition in which Marathon operates and to which Plaintiff can practicably turn for supply of products in the Relevant Product Market.  Marathon is able to increase the price of VOC standard product-gas in Louisville and Northern Kentucky: (1) without independent retailers turning to alternative suppliers located outside of Louisville and Northern Kentucky; and (2) without manufacturers located outside of Louisville and Northern Kentucky flooding Louisville and Northern Kentucky with substitute supply.  Accordingly, a Relevant Geographic Market within the meaning of Section 8 of the Clayton Act, 15 U.S.C. § 18, is the Louisville and Northern Kentucky market.

52.     Hereinafter, "Relevant Market" refers to the "Relevant Product Market and Relevant Geographic Market."

53.     The Relevant Market is highly concentrated.

54.     As articulated in the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission, the Herfindahl-Hirschman Index ("HHI") is a measure of

---

[6] Adjusted VOC gasoline sold in Louisville and Northern Kentucky, however, can also be sold in Chicago and Milwaukee.

market concentration.[7]  Market concentration is often one useful indicator of the level of competitive vigor in a market.  The more concentrated a market, the more likely it is that there is a meaningful reduction in competition harming consumers.  Markets in which the HHI is between 1,500 and 2,500 points are considered to be moderately concentrated and markets in which the HHI is in excess of 2,500 points are considered to be highly concentrated.

55.     Upon information and belief, Kentucky's VOC standard product gas supply is manufactured primarily by Marathon, who has engaged in the business of refining, distributing, and selling approximately 95% of the VOC standard product gasoline in the Louisville and Northern Kentucky market, during the relevant time period.

56.     As of July 2008, Marathon's wholesale market share for VOC standard product was approximately 95%.  Assuming little to no change in the market share since this time, the Louisville and Northern Kentucky wholesale market for VOC standard product is highly concentrated with an HHI of over 9,000, consistent with the *Horizontal Merger Guidelines*.

57.     Marathon owns and operates the only refinery in the state, located in Catlettsburg, Kentucky.  There is only one refined products pipeline joined to this refinery.  Such pipelines are used to transport product among the states, but the refined products pipeline connected to this refinery leads directly out of the Commonwealth.

---

[7] *See* U.S. Dep't of Justice and Federal Trade Commission, Horizontal Merger Guidelines § 5.3 (2010), available at http://www.justice.gov/atr/public/guidelines/hmg-2010.html  The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).  The HHI takes into account the relative size distribution of the firms in a market.  It approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm.  The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

58.     Marathon also owns and operates a refinery in Robinson, Illinois, and that refinery has a refined products pipeline which transports product to Louisville, Kentucky, and a pipeline from Louisville to Lexington.  It can also transport product by pipeline from Robinson to Chicago, Illinois.

59.     The geographic market for RFG gasoline in Kentucky remains largely isolated from other sources of supply.  Marathon is uniquely situated to supply RFG to Louisville and NKY, with its pipeline access directly from Robinson to Louisville, and its Cattletsburg refinery in reasonable proximity for barging product downstream on the Ohio River.

60.     After the introduction of VOC standard product gasoline in 1995, Marathon continued its practice of executing exchange agreements with its horizontal competitors, also refiners and wholesalers of gasoline.

61.     The exchange agreements known to Plaintiff are the subject of this action.  On information and belief, Plaintiff alleges that Marathon entered into other exchange agreements, presently unknown to Plaintiff, with similar intent and effect.

62.     Upon information and belief, during the relevant time period, Marathon entered into exchange agreements with its horizontal competitors, including, but not limited to, ▮▮▮▮▮▮ and ▮▮ , for delivery of VOC standard product gasoline in Louisville and Northern Kentucky, and has since entered into similar exchange agreements for the delivery of VOC standard product gasoline in Louisville and Northern Kentucky with the intent and purpose of limiting refining capacity for VOC standard product gasoline and/or limiting supply.

63.     Through use of these exchange agreements, coupled with its wholesale market dominance, Marathon maintained or attempted to maintain sufficient market power to limit the supply of VOC standard product gasoline and to raise the price at which it sells VOC standard

product gasoline in Louisville and Northern Kentucky to supracompetitive levels.   These agreements have had the effect of raising VOC standard product gasoline prices in Louisville and Northern Kentucky above competitive levels, without any countervailing procompetitive benefit.

64.     The purpose and effect of these agreements was to prevent other major refiners of gasoline, including, but not limited to, ███████ and █████, from upgrading their refinery and supply infrastructure to produce and deliver VOC standard product gasoline to Louisville and Northern Kentucky, thereby avoiding any potential increase in the supply of VOC standard product gasoline in that market, which could destabilize and decrease the market price of VOC standard product gasoline.

65.     From the relevant time period on, other major refiners of gasoline, for example, ███████ and █████, received VOC standard product gasoline from Marathon by executing agreements with Marathon to provide gasoline to their branded retail stations in Louisville and Northern Kentucky.

66.     The effect of these agreements on the wholesale and retail price of retail gasoline is dramatic.  For the period of May 1, 2014 through August 31, 2014, the wholesale Rack price for regular grade unbranded RFG in Louisville averaged $0.228 higher than St. Louis and $0.247 per gallon higher for branded sales.

67.     In the early summer months of 2014, the price differential between Louisville and St. Louis reached almost $0.50 per gallon for unbranded sales and was as high as $0.40 per gallon for branded sales.

68.     The disparity in price between RFG and conventional is also greater in Kentucky than in Missouri.  From May 1, 2014 through August 31, 2014, the RFG-conventional price difference in Louisville was on average almost double that found in St. Louis.

69.     At the retail level, Louisville RFG prices ex-tax for regular grade gasoline averaged $0.173 per gallon higher than in St. Louis over the same time period.

70.     Marathon's VOC standard product exchange agreements limit or attempt to limit supply options available to Kentucky gasoline retailers, depriving them of competitively-priced alternatives, thus suppressing or attempting to suppress competition in Louisville and Northern Kentucky, without any offsetting competitive benefit.

71.     Diversion of available competitively-priced wholesale supply away from unbranded marketers at the rack allowed Marathon to raise prices to unbranded dealers above what they would have been able to demand in a competitive environment.

**VIOLATIONS ALLEGED**

**COUNT 1**
**Violation of the Sherman Act**
**15 U.S.C. § 1**

72.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

73.     Marathon's use of deed restrictions, supply agreements and exchange agreements unreasonably restrain trade, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

74.     Marathon's use of deed restrictions that preclude the use of real property as a retail gasoline station, combined with its dominant market position, the highly concentrated market structure, the history of these restraints, anticompetitive market effects and lack of potential justifications, are unreasonable restraints of trade.

75.     Marathon's use of supply agreements that require unbranded retailers to waive defenses to anticompetitive conduct, combined with its dominant market position, the highly concentrated

market structure, the history of these restraints, anticompetitive market effects and lack of potential justifications, are unreasonable restraints of trade.

76.     Marathon's use of exchange agreements with its horizontal competitors, in light of its dominant market position, the highly concentrated market structure, the anticompetitive market effects and the lack of potential justifications, dissuade horizontal competition from entering the relevant product market and constitute are unreasonable restraints of trade.

77.     Marathon exercised market power through these deed restrictions, supply agreements, and exchange agreements, and used this market power to control supply, elevate prices, and exclude competition.

78.     Marathon's deed restrictions, supply agreements and exchange agreements have had the effect of raising, maintaining, and stabilizing at artificially high levels pricing for both conventional and VOC standard product gasoline.

79.     By using deed restrictions, supply agreements and exchange agreements, Marathon contracted, combined in the form of trust or otherwise, or conspired in restraint of trade or commerce among the several States in violation of 15 U.S.C. § 1.

**COUNT 2**
**Violation of the Sherman Act**
**15 U.S.C. § 2**

80.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

81.     By employing deed restrictions, supply agreements and exchange agreements, Marathon monopolized, attempted to monopolize, or combined or conspired with any other person or persons, to monopolize or attempted to monopolize any part of the trade or commerce among the several States, or with foreign nations, in violation of 15 U.S.C. § 2.

## COUNT 3
## Violation of the Clayton Act
## 15 U.S.C. § 14

82.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

83.     By using supply agreements and exchange agreements, MPC engaged in commerce, in the course of such commerce, leased or made a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States, or fixed a price charged therefor, or discounted from, or rebated upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding was to substantially lessen competition or tend to create a monopoly in any line of commerce, in violation of 15 U.S.C. § 14.

## COUNT 4
## Violation of the Kentucky Consumer Protection Act
## KRS 367.175(1)

84.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

85.     By employing deed restrictions, supply agreements and exchange agreements as described above, Marathon contracted, combined in the form of trust and otherwise, or conspired in restraint of trade or commerce in this Commonwealth, in violation of KRS 367.175(1).

## COUNT 5
### Violation of the Kentucky Consumer Protection Act
### KRS 367.175(2)

86.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

87.    By employing deed restrictions, supply agreements and exchange agreements, Marathon monopolized, attempted to monopolize, or combined or conspired with any other person or persons to monopolize or attempt to monopolize a part of the trade or commerce in this Commonwealth, in violation of KRS 367.175(2).

## COUNT 6
### Violation of the Kentucky Consumer Protection Act
### KRS 367.170(1)

88.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

89.    By employing deed restrictions, supply agreements and exchange agreements as described above, Marathon engaged in unfair, false, misleading, or deceptive acts or practices in the conduct of trade or commerce in violation of KRS 367.170(1).

## COUNT 7
### Unjust Enrichment

90.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

91.    Marathon's conduct was undertaken with the specific purpose of increasing the Rack Price; preventing competition from independent marketers; and pooling and coordinating production and moving product from one marketplace to another to prevent surplus gasoline from lowering prices.

92.     As a proximate result of Marathon's conduct, Marathon has been unjustly enriched by the willful violation of the Commonwealth's statutes, the Sherman Act, and the Clayton Act.

93.     Marathon's conduct conferred a benefit upon itself at the expense of the Commonwealth. Marathon was aware of this benefit and the fact that this benefit came at the expense of the Commonwealth.  Marathon has retained this benefit without compensating the Commonwealth.

## REQUESTED RELIEF

WHEREFORE, the Commonwealth of Kentucky, by and through Attorney General Jack Conway, prays that final judgment be entered against Marathon declaring, ordering, and adjudging that:

94.     The aforesaid deed restrictions, supply agreements and exchange agreements unreasonably restrain trade and are illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1;

95.     The aforesaid deed restrictions, supply agreements and exchange agreements unreasonably restrained trade through monopolization or attempted monopolization, which is illegal under Section 2 of the Sherman Act, 15 U.S.C. § 2;

96.     The aforesaid supply agreements and exchange agreements are acts in commerce where the effect was to substantially lessen competition or tend to create a monopoly in any line of commerce, which is illegal under the Clayton Act, 15 U.S.C. § 14.

97.     The aforesaid deed restrictions, supply agreements and exchange agreements unreasonably restrain trade and are illegal under KRS 367.175(1);

98.     Using deed restrictions, supply agreements and exchange agreements, Marathon unreasonably restrained trade through monopolization or attempted monopolization, which is illegal under KRS 367.175(2);

99.     The aforesaid deed restrictions, supply agreements and exchange agreements are unfair, false, misleading, or deceptive acts or practices in the conduct of trade or commerce, and they are illegal under KRS 367.170(1).

100.    Marathon be permanently enjoined from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out, or renew the aforesaid deed restrictions, supply agreements and exchange agreements, or any other agreement having similar purposes or effects in violation of 15 U.S.C. §§ 1-2, 14; KRS 367.170(1) & 367.175(1)-(2);

101.    That Plaintiff recover damages, as provided by the law, and the amount of such damages be trebled;

102.    Order Marathon to pay a civil penalty in the amount of $2,000.00 for each willful violation of KRS 367.170(1);

103.    Order Marathon to pay restitution for any willful violation of KRS 367.170(1), in an amount to be determined at trial;

104.    Order Marathon to make restitution to the Commonwealth due to Marathon's unfair competition, including disgorgement of wrongfully-obtained revenues, earnings, profits, compensation, and benefits;

105.    Grant the Commonwealth, pursuant to 15 U.S.C. § 15c(a)(2) and 15 U.S.C. § 26, its attorney's fees; and

106.    Grant such other relief as may be determined to be in the public interest in order to preserve a procompetitive market for motor fuels in the Commonwealth of Kentucky.

Respectfully submitted,

JACK CONWAY
ATTORNEY GENERAL


/s/ Sean J. Riley
**Sean J. Riley**
Chief Deputy Attorney General
**Robyn R. Bender**
Assistant Deputy Attorney General
**Laura S. Crittenden**
Assistant Attorney General
Office of the Attorney General
Commonwealth of Kentucky
700 Capital Avenue, Ste. 118
Frankfort, KY 40602
(502) 696-5300 Phone
(502) 564-8310 Fax


**Elizabeth Ungar Natter**
Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
1024 Capital Center Drive
Frankfort, KY 40601
(502) 696-5300 Phone


Dated: May 12, 2015