UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

COMMONWEALTH OF KENTUCKY,                                    Plaintiff,

v.                                              Civil Action No. 3:15-cv-354-DJH

MARATHON PETROLEUM COMPANY,
LP,                                                          Defendant.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

The Commonwealth of Kentucky claims that Marathon Petroleum Company has used its dominant position in the Louisville and Northern Kentucky gasoline markets to further its monopoly and thwart competition in violation of federal and state antitrust laws. (Docket No. 28) Marathon argues that the case should be dismissed because the Commonwealth is prohibited from bringing its claims and the complaint fails to state a plausible claim for relief. The Court will deny the motion as to the Commonwealth's federal antitrust, state antitrust, and deceptive practices claims. But because the people of the Commonwealth only conferred an indirect benefit upon Marathon by buying gasoline at allegedly inflated prices, not a direct benefit as required by Kentucky law, the Court will grant the motion as to the Commonwealth's unjust enrichment claim.

## I.    BACKGROUND

Marathon Petroleum Company, LP is a gasoline distributor. It owns the only refinery in Kentucky, and it is the largest gasoline supplier in Kentucky. (D.N. 18, PageID # 153) It is also the largest reformulated gasoline (RFG)[1] supplier in Louisville and Northern Kentucky. (*Id*.) In

---

[1] RFG is a special type of gasoline that gas stations must sell during the summer in certain parts of Kentucky. *See* 42 U.S.C. § 7545(k)(6)(A); (D.N. 18, PageID # 153, 158-59).

1

fact, Marathon's approximate RFG wholesale market share in Louisville and Northern Kentucky is between 90 and 95 percent.  (*Id.*)

The Commonwealth of Kentucky[2] maintains that Marathon's market share proves that it has a monopoly on RFG in Louisville and Northern Kentucky.  (D.N. 31, PageID # 255)  The Commonwealth attributes Marathon's dominant market share to illegal manipulation of the market through three types of agreements: exchange agreements, supply agreements, and deed restrictions.  (*Id.*)

First, the Commonwealth alleges that Marathon uses exchange agreements with horizontal competitors—i.e., competitors at the same market level—to keep other potential RFG suppliers out of Kentucky.  (*Id.*, PageID # 158); *see Cincinnati Riverfront Coliseum, Inc. v. City of Cincinnati,* 556 F. Supp. 664, 667 (S.D. Ohio 1983).  Exchange agreements "involve a refiner or supplier agreeing to provide gasoline to a competing refiner for sale in a particular area where that competitor has insufficient supply."  (D.N. 28-1, PageID # 219)  Marathon has exchange agreements with ExxonMobil, Shell, and BP for delivery of RFG in Louisville and Northern Kentucky.  (D.N. 18, PageID # 161)

Second, the Commonwealth alleges that Marathon uses supply agreements with unbranded retailers[3] to constrain choice of supplier.  (*Id.*, PageID # 161)  These supply contracts are with Kroger and Swifty and require that those retailers purchase all of their gasoline from Marathon or pay a penalty.  (D.N. 31, PageID # 261-62; D.N. 28-1, PageID # 218)

---

[2] This action was brought by the Office of the Attorney General of the Commonwealth of Kentucky, purportedly "under [KY Rev. Stat. Ann. §§] 367.190, 367.990, the Hart-Scott-Rodino Act, 15 U.S.C. § 15c, which permits states' attorney[s] general[] to bring *parens patriae* suits on behalf of those injured in violation of the Sherman Act and Section 16 of the Clayton Act, 15 U.S.C. § 26."  (D.N. 18, PageID # 156)

[3] The Commonwealth's complaint explains that retailers can either be branded, attracting consumers through brand loyalty, or unbranded, attracting consumers due to price.  (D.N. 18, PageID # 161)

Third, Marathon, together with its wholly-owned subsidiary Speedway LLC, has allegedly sold numerous retail gas station properties saddled with deed restrictions that permit gasoline sales on the property only if the gasoline comes from Marathon.  (D.N. 18, PageID # 163)  Marathon's website states that it has 280 properties in 13 states throughout the Midwest and Southeast with these restrictions.  (*Id*., PageID # 163-64)

The Commonwealth asserts that these agreements, coupled with Marathon's monopoly power, have caused wholesale and retail prices of gasoline to be substantially higher than those found in comparable competitive markets.  (D.N. 31, PageID # 256)  Thus, the Commonwealth sued Marathon, alleging violations of §§ 1 and 2 of the Sherman Act,[4] § 3 of the Clayton Act,[5] and Kentucky common law.  (D.N. 18)  Marathon has moved to dismiss the complaint, arguing that the Commonwealth is prohibited from bringing these claims.  In the alternative, Marathon argues that the Commonwealth fails to allege a plausible factual basis to support a finding of unlawful conduct by Marathon.  (D.N. 28-1, PageID # 214)

## II.    STANDARD

To survive a motion to dismiss for failure to state a claim, the Commonwealth's "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (applying the motion-to-dismiss standard to the plaintiffs' antitrust claims)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Factual allegations are essential; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and the

---

[4] 15 U.S.C. §§ 1 and 2, as well as the analogue under state law, Ky. Rev. Stat. Ann. § 367.175.
[5] 15 U.S.C. § 14 and Ky. Rev. Stat. Ann. §§ 367.170(1) and 367.175(1)-(2).

3

Court need not accept such statements as true.  *Id.*  A complaint whose "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct" does not satisfy the pleading requirements of Rule 8.  *Id.* at 679.  Legal conclusions will not carry a complaint past the motion-to-dismiss stage in the absence of supporting factual allegations, and a plaintiff whose complaint is deficient is not entitled to a fishing expedition for facts to support it.  *See id.* at 678-79.

## III.    DISCUSSION

The Commonwealth supports its legal conclusions with factual allegations.  At this stage, that is enough.  Marathon argues—in a motion that reads more like a motion for summary judgment than a motion to dismiss—that the Commonwealth only alleges conclusions, as opposed to plausible facts.  (*See* D.N. 28-1)  Specifically, Marathon argues that the Commonwealth lacks the authority to bring its claims and that even if it does have the authority, its claims fail as a matter of law based on *Iqbal*'s plausibility standard.  (*Id.*)  The Court will address each argument in turn.

### A. The Commonwealth's Authority

Marathon contends that the indirect-purchaser rule prohibits the Commonwealth from bringing its federal and Kentucky antitrust claims for damages. It also contends that the Commonwealth is prohibited from bringing this claim due to its lack of *parens patriae* authority and the applicable statute of limitations.  (*Id.*)

#### 1) Indirect-Purchaser Rule

Section 4 of the Clayton Act states that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue."  15 U.S.C. § 15.  In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 478-88 (1968), the

4

Supreme Court held that an antitrust defendant could not defend antitrust violations by claiming that the plaintiff "passed on" an illegal overcharge to the plaintiff's customers.  Later, in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 737-38 (1997), the Supreme Court made *Hanover Shoe* reciprocal, holding that an indirect purchaser could not bring a federal antitrust claim even if the antitrust violation's effects were passed down.  However, the *Illinois Brick* Court acknowledged an exception to *Hanover Shoe*.  *Id*. at 735-36.  A "situation in which market forces have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer."  *Id*. at 736 n.16.

This acknowledgment in *Illinois Brick* led to the "control exception."  *See Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enter., Inc.*, 628 F.2d 971, 975 (6th Cir. 1980).  The Sixth Circuit has found that the control exception "is limited to relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has been only one sale."  *Id*.; *see Perkins v. Standard Oil Co.*, 395 U.S. 642, 648 (1969) (holding that having a sixty percent-owned subsidiary was sufficient control); *In re Western Liquid Asphalt Cases*, 487 F.2d 191, 199 (9th Cir. 1973) (finding evidence that the defendants controlled their direct customers either by acquiring their stock or by arranging to finance their purchases).

 The Commonwealth alleges sufficient facts to support the application of the control exception here.  (D.N. 18, PageID # 151-55).  It claims that Speedway is the wholly-owned subsidiary of Marathon.  (*Id*., PageID # 153)  The Commonwealth also alleges that the exchange and supply agreements, coupled with Marathon's dominant market position, give Marathon control over petroleum suppliers.  (*Id*., PageID # 155)  Finally, it asserts that it is suing on behalf of consumers who purchase gasoline at retail outlets owned or controlled by Marathon.  (*Id*.,

PageID # 156)   At this stage, the allegations are sufficient to support a finding that the control exception applies.

Marathon's contention that the Supreme Court's holding in *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990), rejects any exception to the indirect-purchaser rule is misguided.   The *UtiliCorp* Court concluded: "[E]ven assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions.   Having stated the rule in *Hanover Shoe*, and adhered to it in *Illinois Brick*, we stand by our interpretation of § 4."   *Id.* at 217.   The *Illinois Brick* Court discussed the control exception.   431 U.S. at 736 n.16.   The *UtiliCorp* Court simply refused to expand the scope of exceptions.[6]   497 U.S. at 217.   Consequently, the control exception to the indirect-purchaser rule is not barred, and the Commonwealth has alleged sufficient facts to meet this exception.

### 2)   *Parens Patriae* Authority

Marathon concedes that the Commonwealth can bring a federal antitrust claim for damages under the Sherman Act but disputes that it may do so under the Clayton Act.   (D.N. 28-1, PageID # 229 (citing 15 U.S.C. § 15c))   While 15 U.S.C. § 15c expressly permits a state attorney general to bring an antitrust suit based on the Sherman Act, the statute is silent as to the Clayton Act.   However, the Supreme Court has interpreted 15 U.S.C. § 15c as creating "a new procedural device—*parens patriae* actions by States on behalf of their citizens—to enforce existing rights of recovery under § 4 [of the Clayton Act]."   *UtiliCorp*, 497 U.S. at 219 (quoting

---

[6] Although there does not appear to be Sixth Circuit authority on this issue, other circuits have held that *UtiliCorp* did not abolish the exceptions articulated in *Illinois Brick*.   *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 748-49 (9th Cir. 2012); *Kloth v. Microsoft Corp.*, 444 F.3d 312, 321 (4th Cir. 2006); *Howard Hess Dental Lab. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 371-72 (3d Cir. 2005); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605-06 (7th Cir. 1997).

*Illinois Brick Co.*, 431 U.S. at 734, n.14).  Section 4 of the Clayton Act "affords relief only to a person 'injured in his business or property by reason of anything forbidden in the antitrust laws," *id.* (quoting 15 U.S.C. § 15(a)), and thus "[s]tate attorneys general may bring actions on behalf of consumers who have such an injury."  *Id.*  The Court therefore concludes that the Commonwealth may bring a claim for damages under the Clayton Act.

### 3)  Statute of Limitations

Marathon concedes that the four-year statute of limitations for federal antitrust claims does not bar the Commonwealth's suit because of the continuing-violation doctrine.  (D.N. 34, PageID # 315); 15 U.S.C. § 15b; *see Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 338 (1971).  But Marathon contends that the Commonwealth can only recover damages for events occurring four years prior to the filing of the Complaint on May 12, 2015.  (D.N. 34, PageID # 315)  The Court will not consider the applicable statute of limitations' effect on damages at this time.

### B.  Federal Claims

Irrespective of the Commonwealth's power to bring these claims, Marathon argues that the Commonwealth alleges insufficient facts to maintain its Sherman Act and Clayton Act claims.  (D.N. 28-1)  The Court, however, finds that the Commonwealth has alleged sufficiently plausible facts to avoid dismissal of its complaint under Rule 12(b)(6).

### 1)  Section 1 of the Sherman Act

The Commonwealth alleges that Marathon's use of exchange agreements, supply agreements, and deed restrictions unreasonably restrains trade in violation of § 1 of the Sherman Act.  (D.N. 18, PageID # 166)  Section 1 states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or

with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Section 1 applies only to unreasonable restraints on trade. *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014). Whether a restraint is unreasonable is determined by either the *per se* rule or the rule of reason. *Id.* (citation omitted). Marathon contends that the Commonwealth is pursuing this claim through the rule of reason because its amended complaint cut out a previous reference to the *per se* rule. (D.N. 28-1, PageID # 217) But in its response, the Commonwealth argues for the application of both. (D.N. 31, PageID # 259) The Court will examine the allegations under the *per se* rule and the rule of reason.

The *per se* rule is only appropriate for "conduct that is manifestly anticompetitive, that is, conduct that would always or almost always tend to restrict competition and decrease output." *Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) (internal citations and quotations omitted). "Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices or to divide markets." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citations omitted). The Commonwealth relies on this quote to contend that Marathon's agreements are *per se* unreasonable. (D.N. 31, PageID # 259-60) But a few sentences later, the Supreme Court stated that "[t]o justify a *per se* prohibition a restraint must have manifestly anticompetitive effects . . . and lack . . . any redeeming virtue." *Leegin*, 551 U.S. at 886 (internal citations and quotations omitted).

There is nothing on the face of Marathon's horizontal agreements that rises to this level. There are no allegations that the agreements contain clauses in which the competitors agree not to compete. And the agreements have redeeming qualities. The horizontal agreements allow other petroleum producers access to the market without the upfront cost of building a refinery. And, notably, the *per se* rule does not apply to vertical agreements—i.e., the supply agreements

8

and deed restrictions. *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1013 (6th Cir. 2005) ("Vertical distribution restraints are to be tested under the rule of reason."). Thus, the Commonwealth's alleged facts do not state a *per se* violation of § 1.

The Commonwealth does, however, allege sufficient facts to support a § 1 claim under the rule of reason. To state a prima facie case, the Commonwealth must allege: "(1) a conspiracy; (2) that produced anticompetitive effects; (3) that the scheme affected relevant product and geographic markets; (4) that the conspiracy's goal and related conduct was illegal; (5) and that the restraint was the proximate cause of the plaintiff's antitrust injury." *In re Milk*, 739 F.3d at 272 (internal quotations omitted).

The Commonwealth's alleged facts are sufficient under this test. First, it is undisputed that the Commonwealth has alleged a conspiracy. Second, the Commonwealth has adequately alleged anticompetitive effects, namely Marathon's high market share and the region's higher prices than comparable markets. (*See* D.N. 18, PageID # 165) Third, the scheme is alleged to have affected RFG sales in the exact location where RFG is required to be sold. (*See id.*) Fourth, the Commonwealth alleges that the conspiracy's goal of maintaining higher prices and a monopoly, and the related conduct—the horizontal agreements, supply agreements, and deed restrictions—are illegal. (*Id.*, PageID # 154, 170) And finally, the Commonwealth alleges that Marathon's illegal conduct resulted in higher prices. (*Id.*, PageID # 155)

Marathon proposes a different test for the rule of reason. (D.N. 28-1, PageID # 217 (citing *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 959-60 (6th Cir. 2004)))[7] Under that four-prong test, Marathon contends, one prong is not

---

[7] Marathon applies the following test, while generally citing *Worldwide Basketball*, 388 F.3d at 959-60, as support for the application of this test: "(1) a relevant market for the product or service at issue, (2) that the parties to the agreement or conspiracy have market power in that

met: harm to overall competition.  (*Id*.)  It argues that "it is entirely implausible that Marathon harmed overall competition."  (*Id*.)  But it is plausible.  The Court will address each of Marathon's arguments.

Marathon urges the Court to use common sense regarding the deed restrictions, stating that there must be plenty of suitable sites for retail gas stations remaining, and thus Marathon has not encumbered enough properties to harm overall competition.  (D.N. 34, PageID # 307)  But that is pure speculation.  Even if Marathon owns only 30 properties in this region, at this stage of the litigation, it is difficult for the Court to assess the overall effect.   Accepting the Commonwealth's allegations as true, the Court finds it to be plausible that deed restrictions on a significant number of retail locations would harm overall competition.

The Commonwealth's supply-agreement allegations are also sufficient to sustain a § 1 claim.  Marathon relies on the lack of foreclosure allegations here.  (D.N. 34, PageID # 308)  For exclusive-dealings claims, such as the Commonwealth's supply-agreement claim, the competitors that are left out of the contracts, or foreclosed, "must be found to constitute a substantial share of the relevant market."  *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961).  The target is thirty to forty percent.  *B & H Med., L.L.C. v. ABP Admin., Inc.*, 526 F.3d 257, 266 (6th Cir. 2008).  But both cases Marathon relies on, *Tampa Electric* and *B & H*, were decided on summary judgment.  It would be improper to dismiss this claim at the pleading stage for a failure to show substantial foreclosure.  *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 452 n.12 (4th Cir. 2011) ("While [plaintiff] did not allege a specific

---

market, (3) that the anticompetitive effects of the challenged conduct outweigh the pro-competitive benefits, and (4) that the challenged conduct caused injury to overall competition." (D.N. 28-1, PageID # 217)  *Worldwide Basketball* does mention an alternative, abbreviated test, *see* 388 F.3d 955, 960, but Marathon does not cite, or argue for the application of, the abbreviated test.

percentage of market foreclosure in its Counterclaim, it would be problematic to reject its Counterclaim, with its extensive factual allegations, solely on that basis at the pre-discovery, motion-to-dismiss stage, when [plaintiff] likely has insufficient information to calculate a precise number.  In contrast, *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2009), and *Tampa Electric*, 365 U.S. 320, in which foreclosure percentages were determined, were decided after a bench trial and on summary judgment, respectively.").

Finally, the Commonwealth's exchange-contracts allegations are also sufficient to sustain a § 1 claim.  The Commonwealth contends that Marathon has entered exchange agreements with major competitors and uses these agreements to "limit or attempt to limit supply options available to Kentucky gasoline retailers, depriving them of competitively priced alternatives." (D.N. 18, PageID # 161)  Marathon argues that exchange agreements have procompetitive benefits, such as allowing petroleum companies access to markets without substantial investments in refineries.  (D.N. 43, PageID # 309)  Marathon may be correct, but that does not mean that all exchange agreements are procompetition.  Marathon also contends that there are no plausible facts showing that these exchange agreements are anticompetitive.  (*Id.*)  But this is not the case.  "[M]any joint arrangements and operations in which members of the industry engage already may provide the opportunity for collusion on price and output."  *Marathon Oil Co. v. Mobil Corp.*, 669 F.2d 378, 383 (6th Cir. 1981).  The Court cannot yet determine whether these exchange agreements are meant to further Marathon's alleged stranglehold on RFG in Louisville and Northern Kentucky.  But at this stage, the facts alleged are sufficient for the Court to draw the reasonable inference that they are.  It is plausible that Marathon meant to discourage other suppliers from creating supply to the market with these agreements.  Again, discovery is necessary on this point.

11

In sum, the Commonwealth has alleged sufficiently plausible facts to maintain its § 1 claim, and thus this portion of Marathon's motion to dismiss will be denied.

### 2) **Section 2 of the Sherman Act**

The Commonwealth has also alleged sufficiently plausible facts to maintain its § 2 claim. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty" under § 2 of the Sherman Act. 15 U.S.C. § 2. There are two elements to a § 2 claim. *Eastman Kodak Co. v. Image Tech. Serv., Inc.*, 504 U.S. 451, 481 (1992). The first element is the possession of monopoly power. *Id.* The Commonwealth has alleged that Marathon has an approximate RFG wholesale market share of 90 to 95 percent in Louisville and Northern Kentucky and uses that share to execute beneficial agreements. (D.N. 18, PageID # 153) At this stage, these allegations are sufficient to satisfy the first element. *See Eastman Kodak*, 504 U.S. at 481-82.

The mere possession of a monopoly is insufficient; there must also be anti-competitive conduct. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Thus, the second element, and the point of contention here, "is the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman*, 504 U.S. at 482-83 (1992) (internal quotation marks omitted). The Commonwealth has alleged sufficiently plausible facts to satisfy this element. It is plausible that Marathon intends to foreclose the market with its exchange agreements. (D.N. 18, PageID # 158-61) The supply agreements could help Marathon control output and increase prices of RFG in the market. (*Id.*, PageID # 161-62) And the deed restrictions explicitly keep competitors out of the market. (*Id.*, PageID # 163-65)

"A monopolist is not free to take certain actions that a company in a competitive . . . market may take, because there is no market constraint on a monopolist's behavior." *LePage's, Inc. v. 3M*, 324 F.3d 141, 151-52 (3d Cir. 2003).  Marathon offers a series of reasons why its agreements are not exclusionary.  (D.N. 28-1, PageID # 221)  It relies heavily on *Stearns Airport Equipment Co., Inc. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999), a Fifth Circuit summary judgment case, for the idea that if there is any business justification for the agreements, then they do not violate § 2.  (D.N. 28-1, PageID # 221)  Marathon's reliance on *Stearns* is misplaced.  The Fifth Circuit was only discussing an *inference* that supports a finding of exclusionary conduct where the defendant offers *no* rational business purpose.  *Stearns*, 170 F.3d at 522.  The inverse does not necessarily flow from that inference.  In any event, the pleadings alone are insufficient to establish that a rational business purpose existed, and at the motion-to-dismiss stage, the Court takes the plaintiff's factual allegations as true.  *Iqbal*, 556 U.S. at 678.

"Anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002) (internal quotation marks omitted).  Discovery should provide the facts necessary to establish the context here.  At this point, considering only the facts alleged, the Court concludes that those facts support a reasonable inference that Marathon has engaged in anticompetitive conduct under § 2 of the Sherman Act.  Consequently, this portion of Marathon's motion to dismiss will also be denied.

### 3)  Section 3 of the Clayton Act

The Commonwealth's alleged facts are sufficiently plausible to maintain its § 3 claim. Section 3 of the Clayton Act makes it unlawful

> for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery,

> supplies, or other commodities . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.  Like § 2 of the Sherman Act, § 3 of the Clayton Act generally requires a showing of two elements: (1) exclusive dealing and (2) foreclosure of or "substantially lessened" competition.  *See Tampa Elec.*, 365 U.S. at 326-27.  Marathon contends that the Commonwealth has failed to allege sufficiently plausible facts as to either element.  (D.N. 28-1, PageID # 222)  The Court disagrees.

The Commonwealth first alleges that Marathon has supply agreements that require retailers to buy 100% of their listed RFG amounts from Marathon or pay a penalty.  (D.N. 18, PageID # 158)  Marathon contends that the Commonwealth "merely assumes, without any factual support, that a stated volume commitment is necessarily the same thing as exclusivity." (D.N. 34, PageID # 311)  But "even though a contract does not contain specific agreements not to use the [goods] of a competitor, if the practical effect . . . is to prevent such use, it comes within the condition of the section as to exclusivity."  *Tampa Elec.*, 365 U.S. at 326 (alteration and omission in original) (internal quotation marks omitted).  The practical effect of requiring a retailer to buy 100% of its listed RFG amounts from Marathon or pay a penalty is to prevent the purchase of a competitor's products.  Therefore, the Commonwealth has alleged sufficient facts concerning exclusivity to avoid dismissal at this stage.

As to market foreclosure, it would be improper, as the Court stated above, to dismiss this claim at the pleading stage for a failure to show substantial foreclosure.  *See E.I.*, 637 F.3d at 452 n.12.  At this stage, "a finding of domination of the relevant market by the lessor or seller [is]

sufficient to support the inference that competition had or would be substantially lessened by the contracts involved." *Tampa Elec.*, 365 U.S. at 326.   The Commonwealth has alleged facts showing that Marathon has a dominant market share of RFG in Louisville and Northern Kentucky.  (D.N. 18, PageID # 153-54, 160)  This domination, in addition to the exclusive nature of the supply agreements, is sufficient for the Court to draw a reasonable inference that Marathon is liable for a § 3 Clayton Act violation.

### C.  Kentucky Law Claims

The Commonwealth asserts four claims based on state law: two Ky. Rev. Stat. Ann. § 367.175 claims, one Ky. Rev. Stat. Ann. § 367.170 claim, and one unjust enrichment claim. (D.N. 18, PageID # 169)  Marathon contends that all four should be dismissed.  (D.N. 28-1, PageID # 230-33)  The Court will dismiss the unjust enrichment claim, but not the others.

Section 367.175 is Kentucky's version of the Sherman Act.  *Compare* Ky. Rev. Stat. Ann. § 367.175 (West 2016) *with* 15 U.S.C. §§ 1, 2.  Because the Commonwealth's Sherman Act claims are sufficiently plausible, its § 367.175 claims are also sufficiently plausible.  *See KASP, Inc. v. Adesa Lexington, LLC*, No. 6:05-394-DCR, 2006 WL 385310, at *10 (E.D. Ky. Feb. 17, 2006) (finding that "where a plaintiff can establish a claim under the Sherman Act, it has also established a claim under the KCPA").  Marathon argues that Kentucky adopted *Illinois Brick* in *Arnold v. Microsoft Corp.*, No. 2000-CA-2144-MR, 2001 WL 1835377 (Ky. Ct. App. Nov. 21, 2001), and thus the Court should dismiss the Commonwealth's claims because it is suing on behalf of indirect purchasers.  (D.N. 28-1, PageID # 231)  But as explained above, the indirect-purchaser rule does not bar the Commonwealth's claims because the control exception applies.  *See Jewish Hosp.*, 628 F.2d at 975; *KASP*, 2006 WL 385310, at *10.  Moreover, *Arnold* is unpublished and is not binding precedent.  *See* Ky. R. Civ. P. 76.28(4)(c).

Marathon's final contention that the statute does not authorize damages is also unpersuasive.  (D.N. 28-1, PageID # 231)  Kentucky law allows its Attorney General to bring a claim for restitution on behalf of Kentucky citizens.  Ky. Rev. Stat. Ann. § 367.200 (West 2016); *Com. ex rel. Beshear v. ABAC Pest Control, Inc.*, 621 S.W.2d 705, 706 (Ky. Ct. App. 1981) (holding "that the legislature, in enacting KRS 367.200, intended to vest the Attorney General with the authority to seek restitution on behalf of defrauded consumers."); *see Fed. Trade Comm'n v. Mylan Labs., Inc.*, 99 F. Supp. 2d 1, 6 (D.D.C. 1999) (holding that Kentucky's Attorney General can bring a claim for restitution on behalf of indirect purchasers).

Marathon also contends that the Commonwealth's § 367.170 claim should be dismissed because it is based on implausible facts and there is no privity of contract between the people the Commonwealth represents and the relevant agreements.  (D.N. 28-1, PageID # 231-32; D.N. 34, PageID # 316)  The Commonwealth's facts, however, are plausible, and privity of contract is not an issue.

Section 367.170(1) states that "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  *See* Ky. Rev. Stat. Ann. § 367.170(2) (West 2016) (defining unfair "to mean unconscionable").  "The words 'unfair, false, misleading or deceptive' are 'defined in terms generally understood and perceived by the public.'"  *Corder v. Ford Motor Co.*, 285 F. App'x 226, 227-28 (6th Cir. 2008) (quoting *Smith v. General Motors Corp.*, 979 S.W.2d 127, 131 (Ky. Ct. App. 1998)).  The statute is to be construed broadly "to effectuate its purpose of 'curtail[ing] unfair, false, misleading or deceptive practices in the conduct of commerce.'"  *Com. ex rel. Chandler v. Anthem Ins. Cos., Inc.*, 8 S.W.3d 48, 54 (Ky. Ct. App. 1999) (quoting *Com. v. N. Am. Van Lines, Inc.*, 600 S.W.2d 459, 462 (Ky. Ct. App. 1979)).  The Commonwealth's alleged facts support a reasonable inference of

unfair conduct for the same reasons that they support a reasonable inference of federal and Kentucky antitrust violations.  *See* part III.B, *supra*.

And privity is not an issue in this case.  Section 367.220 lists the class of individuals who may seek a private remedy for a § 367.170 violation.  This provision requires privity of contract to 'exist between the parties in a suit alleging a violation of the Consumer Protection Act." *Skilcraft Sheetmetal, Inc. v. Ky. Mach., Inc.*, 836 S.W.2d 907, 909 (Ky. Ct. App. 1992); *see Ky. Laborers Dist. Council Health & Welfare Tr. Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 772-73 (W.D. Ky. 1998).  But this section applies to private individuals, not Kentucky's Attorney General.  *See Ky. Laborers*, 24 F. Supp. 2d at 773.  In the context of the Kentucky Consumer Protection Act statutory scheme, § 367.200—not § 367.220—"seems intended to permit a court to order relief for the consumer on whose behalf the Attorney General successfully brought suit."  *Id.* (noting that § 367.200 comes directly after § 367.190, which gives Kentucky's Attorney General the authority to maintain an action for injunctive relief) (citing *Com. ex rel. Beshear v. ABAC Pest Control, Inc.*, 621 S.W.2d 705, 706 (Ky. Ct. App. 1981) ("We hold, therefore, that the legislature, in enacting [section] 367.200, intended to vest the Attorney General with the authority to seek restitution on behalf of defrauded consumers . . . .")).  The Kentucky Attorney General's power to bring consumer-protection suits falls outside of § 367.220, and thus privity is not necessary.

Finally, the Commonwealth's unjust enrichment claim will be dismissed because the Commonwealth fails to allege that the plaintiff conferred a direct benefit upon Marathon.  To state an unjust enrichment claim under Kentucky law, the Commonwealth must plead: "(1) [a] benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value."  *Jones v.*

17

*Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009).  "Kentucky courts have consistently found that the first element not only requires a benefit be conferred upon the defendant, but also that the plaintiff be the party conferring that benefit."  *Pixler v. Huff*, No. 3:11-CV-00207-JHM, 2011 WL 5597327, at *11 (W.D. Ky. Nov. 17, 2011) (collecting cases).  To meet the first element, "a plaintiff must allege that he directly conferred a benefit on the defendant."  *SAAP Energy v. Bell*, No. 1:12-CV-98, 2013 WL 4588828, at *2 (W.D. Ky. Aug. 28, 2013).

The Commonwealth fails to allege that it, or the people it represents, directly conferred a benefit upon Marathon.  Instead, in its pleading, the Commonwealth alleges that "Marathon's conduct conferred a benefit upon itself."  (D.N. 18, PageID # 169)  This is insufficient.  The Commonwealth contends that the Court must read the pleading as a whole.  (D.N. 31, PageID # 293)  But even read as a whole, the complaint is insufficient on this point.  The best argument the Commonwealth has, as set forth in its response, is that the people indirectly conferred a benefit upon Marathon.  (*Id.*, PageID # 292-93)  That is, Marathon charged anticompetitive prices for RFG; retailers then passed the cost to customers; customers paid these prices; and Marathon profited.  (*See id.*, PageID # 292)  This indirect relationship is insufficient to plead unjust enrichment, *see SAAP Energy*, 2013 WL 4588828, at *2, and thus this portion of Marathon's motion to dismiss will be granted.

## IV.   CONCLUSION

Although the Commonwealth fails to state a claim of unjust enrichment, it has alleged sufficiently plausible facts to support its federal antitrust and Kentucky Consumer Protection Act claims against Marathon.  It has also alleged sufficient facts establishing its authority to bring these claims.  Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** that Defendant Marathon Petroleum Company LP's Motion to Dismiss (D.N. 28) is **GRANTED** in part and **DENIED** in part.  The motion is granted as to Plaintiff's unjust enrichment claim (D.N. 18, PageID # 169 ("COUNT 7")).  The motion is denied as to all other claims.