# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
### Louisville, Kentucky

*ELECTRONICALLY FILED*

| | |
|---|---|
| COMMONWEALTH OF KENTUCKY, *EX REL.* ATTORNEY GENERAL, ANDY BESHEAR, | |
| *Plaintiff,* | Case No. 15-CV-00354-DJH |
| v. | |
| MARATHON PETROLEUM CORPORATION, MARATHON PETROLEUM COMPANY, LP, and SPEEDWAY LLC | **COMPLAINT WITH JURY TRIAL DEMANDED** |
| *Defendants*. | |

## SECOND AMENDED COMPLAINT

The Plaintiff, Commonwealth of Kentucky *ex rel.* Attorney General Andy Beshear ("Plaintiff"), for the Complaint, alleges as follows for violation of the Sherman Act, the Clayton Act, the Kentucky Consumer Protection Act, and other legal and equitable causes of action. The Plaintiff seeks damages, restitution, treble and punitive damages, injunctive relief, and civil penalties against the Defendants Marathon Petroleum Corporation ("Marathon Petroleum Corp."), Marathon Petroleum Company, LP ("Marathon Petroleum Co."), and Speedway LLC ("Speedway") (collectively, "Marathon"):

### INTRODUCTION

1.     Plaintiff, by this action, seeks to prevent Marathon from continuing to engage and attempting to engage in anticompetitive conduct including, for example: (1) manipulating the market for reformulated gasoline ("RFG") in Louisville and Northern Kentucky (hereinafter

"Louisville and NKY") through the use of exchange agreements that dis-incentivize Marathon's horizontal competitors from entering these markets; (2) entering into agreements that unreasonably restrict the ability of gasoline retailers to purchase supply from competitors to sell directly to Kentucky consumers; (3) requiring wholesale unbranded customers to waive their rights to rectify violations of the antitrust and consumer protection laws by Marathon; and (4) requiring deed restrictions on certain parcels of real property sold by Marathon or any of its subsidiaries that create barriers to entry to competitors from entering the relevant market.  As a result of this conduct, Marathon has willfully maintained a monopoly and unreasonably restrained competition in the market for RFG in Louisville and NKY allowing Marathon to raise prices above or reduce output, service, and innovation below what would likely prevail in the absence of these agreements.

2.      By this conduct, Marathon has violated and continues to violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, and KRS 367.170(1) & 367.175(1)-(2), as well as the common law of Kentucky.

## BACKGROUND

3.      Gasoline is an integral part of the Kentucky economy, powering all types of family, domestic, and commercial automobiles that make the state economy function.  In 2011, based on independent publicly available data, approximately 794,400 gallons of gasoline were sold at retail each day in Kentucky.

4.      For many years, Kentucky residents and resident businesses purchasing gasoline as a necessary good have endured elevated prices at retail locations.  For example, independent pricing data indicates that in the early summer of 2014, Louisville consumers of retail gasoline paid as much as $0.42 more per gallon of gasoline than similarly situated St. Louis consumers, with St.

2

Louis being a comparable market with similar fuel grade requirements. Many in Kentucky have wondered why retail gasoline prices seem so often irrationally higher and disconnected from those of our border states, frequently resulting in Kentucky citizens paying more to get to work and take their children to school than similarly situated individuals residing outside the Commonwealth. The answer appears in the unlawful, anticompetitive business activities engaged in by Marathon, as outlined in this Complaint.

5.     Marathon is a fully integrated distributor of gasoline and other petroleum-based products and owns and/or operates an integrated refining, marketing and transportation system. Marathon owns seven refineries, including the only refinery in the Commonwealth of Kentucky and is the largest refiner in the Midwest. Its Catlettsburg, Kentucky refinery is Marathon's third largest refinery, producing approximately 242,000 barrels per calendar day. Marathon's transportation network consists of over 8,300 miles of pipeline which it owns, leases, or has ownership interests in and Marathon owns or leases a large inland fleet of barges and towboats. Marathon owns and operates 63 terminals, six of which are located in the Commonwealth of Kentucky. Marathon's Kentucky terminals have a total storage capacity of 2.3 million barrels.

6.     Marathon Petroleum Corp.'s wholly-owned subsidiary, Speedway LLC, is the second largest company owned and operated convenience store chain in the country, with approximately 2,750 stores in 22 states, and 144 of those stores are located in Kentucky. In addition, there are approximately 5,500 Marathon brand locations owned by independent entrepreneurs in 19 states and 586 of those outlets are located in the Commonwealth of Kentucky.

7.     Marathon is the largest supplier of gasoline in the Commonwealth of Kentucky, and largest supplier of RFG in the Louisville and NKY markets. On information and belief, Marathon

3

has an approximate wholesale market share of 90 to 95 percent in the Louisville and NKY markets. Marathon maintains and/or attempts to maintain this market dominance through the combined use of a variety of contractual arrangements which, as set forth in greater detail herein, restrict competition in the Louisville and NKY markets and throughout the Commonwealth of Kentucky.

8.      Marathon's dominant market position has allowed it to illegally manipulate and attempt to manipulate the market for RFG in the Louisville and NKY markets.  Marathon is the largest supplier of wholesale compliant RFG to the Louisville and NKY areas. Marathon executes Exchange Agreements with its horizontal competitors that have the effect of:  (1) dividing or allocating production; and (2) reducing the motivation for competitors to enter the Louisville and NKY markets to supply RFG.

9.      Marathon has used its dominant market position to require certain independent retail sellers of gasoline to execute anticompetitive supply arrangements that, on information and belief, limit the retailers' ability to obtain gasoline from Marathon's competitors and bind the retailers to adhere to stated volumetric purchases from Marathon subject to penalty.  Furthermore, these supply agreements require retailers to waive their right to claim that Marathon's pricing is unfair or anticompetitive.

10.     As part of its scheme to reduce options and increase prices directly to consumers of gasoline in the Commonwealth of Kentucky, Marathon imposes deed restrictions to restrict real property owners from entering the retail market for gasoline, thereby limiting the available supply of gasoline and increasing the price of gasoline directly harming consumers within the relevant market area within the Commonwealth of Kentucky.  Certain deed restrictions have instead restricted competition by requiring the property purchaser to sell only Marathon petroleum

4

products.  This conduct deprives consumers of an increase in the number of retail gasoline stations selling competitively priced gasoline, suppresses unbranded or other branded retailers as a competitive force throughout Kentucky, and illegally restricts a potential seller of motor fuels from choosing a supplier other than Marathon.

11.    Marathon has effective control over the retail price of gasoline in Kentucky and RFG in Louisville and NKY as a result of: (i) Marathon's monopoly over the wholesale supply of gasoline in Kentucky and RFG in Louisville and NKY; (ii) Marathon's anticompetitive agreements highlighted herein; (iii) Marathon's ownership of retail outlets for the sale of gasoline in Kentucky and RFG in Louisville and NKY; and (iv) the nature of the market for the sale of gasoline and RFG, most notably the price sensitivity of consumers of gasoline and RFG and the relatively small net margins for retailers of these products.   As a result of the above, the consumers of the Commonwealth of Kentucky pay higher prices than consumers in regions where competition exists.

## JURISDICTION & VENUE

12.    This Court has subject matter jurisdiction over this action under 15 U.S.C. §§ 4, 26, and 28 U.S.C. §§ 1331, 1337, because this case arises under federal statutes protecting trade and commerce against restraints and monopolies, seeking to prevent, restrain, and enjoin violations of federal antitrust laws.  Marathon is engaged in interstate commerce and in activities substantially affecting interstate commerce.  Marathon supplies gasoline throughout the United States and is engaged in a regular, continuous, and substantial flow of interstate commerce, and its distribution business has had a substantial effect upon interstate commerce.

13.    This Court has jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or

controversy.

14.     This Court has personal jurisdiction over Marathon, because it transacts business and is found within the Western District of Kentucky.

15.     Venue is proper in the Western District of Kentucky, under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)(d).

**PARTIES**

16.     Plaintiff Andy Beshear, as the duly elected Attorney General of the Commonwealth of Kentucky, is responsible for the enforcement and administration of Kentucky law, including but not limited to the Consumer Protection laws set forth in Chapter 367 of the Kentucky Revised Statutes.  The Attorney General is authorized to bring this action under KRS 367.190, 367.990, and the Hart-Scott-Rodino Act, 15 U.S.C. § 15c, which permits states' attorney generals to bring *parens patriae* suits on behalf of those injured in violation of the Sherman Act and Section 16 of the Clayton Act, 15 U.S.C. § 26.  Plaintiff has standing to pursue these claims pursuant to *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) and its progeny as the consumers of the Commonwealth of Kentucky purchase gasoline at retail outlets: (i) owned by Marathon; (ii) sufficiently controlled by Marathon such that the retail price charged is effectively controlled by Marathon; and/or (iii) which have contractually given up their right to pursue antitrust claims against Marathon.

17.     Defendant Marathon Petroleum Corporation is a Delaware Corporation.  It is engaged in the business of petroleum refining and marketing and lists a principal office address in Findlay, Ohio, on its filings with the Securities and Exchange Commission.

18.     Defendant Marathon Petroleum Company, LP, is a Delaware Limited Liability Company registered to do business in Kentucky.  It is engaged in the business of petroleum refining

6

and marketing and lists a principal office address in Findlay, Ohio, on its registration filings with the Kentucky Secretary of State.

19.     Speedway LLC is a Delaware Limited Liability Company registered to do business in Kentucky.  It is engaged in the business of gasoline and convenience item sales and lists a principal office address in Enon, Ohio, on its registration filings with the Kentucky Secretary of State.

20.     On January 1, 1998, Marathon Oil Company signed a definitive joint venture agreement with Ashland, Incorporated.  That agreement resulted in a merger in 2004 into Marathon Ashland Petroleum ("MAP").   MAP subsequently divided into two companies, Marathon Petroleum Corp., which is the successor to MAP's refining, transportation, and marketing businesses; and Marathon Oil Corp., which took over Marathon's crude oil exploration and production. Marathon Petroleum Corp., together with its subsidiaries including Marathon Petroleum Co. and Speedway, is one of the largest petroleum product refiners, marketers, and transporters in the United States.

## DEFINITIONS

21.     "RFG" is an acronym for reformulated gasoline which was mandated by the 1990 amendments to the Clean Air Act.

22.     "Refinery" is a facility that separates crude oil into products such as gasoline, fuel oil, lubricants, and kerosene.

23.     "Retailer" is a firm (other than a refiner or reseller) that carries on the trade or business of purchasing refined petroleum products and reselling them to consumers at service stations.

24. "Rack Price" is the price paid at a refiner's wholesale distribution facility known as "the rack." Typically, there are different rack prices for branded gasoline and unbranded gasoline.

25. "Spot Market" is a market for short-term bulk gasoline purchases.

26. "Exchange Agreement" is a contract between two refiners by which the two companies trade gasoline, including but not limited to reciprocal buy-sell agreements.

27. "Relevant Time Period" is the time period from January 1, 1998, to the present.

28. "Summer RFG" is that specific formulation of RFG that is compliant to the Louisville and NKY gasoline markets from May 1 to September 15 in any given calendar year.

29. "Person" is any individual, partnership, corporation, association, firm, or other legal entity.

## RELEVANT MARKETS

30. The relevant market for purposes of this action is the wholesale sale of Summer RFG in Louisville and NKY. The relevant product, Summer RFG, is a commodity and is not differentiated as it must be formulated in accordance with applicable Federal regulations.

31. Marathon now holds, and since at least 2004 has held, monopoly power in this relevant market.

## MARATHON'S PRACTICES

I. **Marathon Uses A Number of Contractual Provisions Which Protect its Monopoly in the Wholesale Market and Limit Competition at the Retail Level.**

A. **Exchange Agreements with Horizontal Competitors Keep Other Potential RFG Suppliers Out of Kentucky.**

8

29.     In 1990, the Clean Air Act was amended to prescribe specific requirements to sell RFG in explicitly identified states and cities not attaining a previously established air quality target. States and regions not required to participate were permitted to opt-in to the program.

30.     The RFG program aims to reduce ground-level ozone-forming pollutants and reduce toxic pollutants as well as smog in the air breathed by the public, especially in cities. The RFG regulations set content criteria and emissions-based performance standards for refiners.

31.     While no city in Kentucky was required to use RFG by these Amendments, the governor of Kentucky opted-in to the program, on January 1, 1995, under Section 211(k)(6)(A) of the Clean Air Act. This opt-in requires retailers to sell a particular type of RFG in: Boone County, Campbell County, Jefferson County, Kenton County, and portions of Bullitt and Oldham Counties. Outside of Louisville and NKY, retailers are permitted to sell conventional gasoline during this seasonal time-period.

32.     The RFG program implements a volatile organic compound ("VOC") control period during the summer, generally effective May 1 through September 15 at all facilities.

33.     For Louisville and NKY, the summer VOC control period requires that RFG have a VOC standard emission reduction of 23.4%. Other methods of powering motor vehicles or equipment are not in the same market as Summer RFGs, because those methods do not comply with the EPA regulations, are less convenient, are more cumbersome, or are too expensive. For instance, the summer standard for Chicago or Milwaukee RFG blended with 10% ethanol is a minimum VOC emission reduction of 21.4% and is considered Region 2 "Adjusted VOC gasoline." This "Adjusted VOC gasoline," is less stringent than the Summer RFGs for Louisville and NKY. For this reason,

Adjusted VOC gasoline sold in markets without similar VOC emission standards is not sold in the Louisville and NKY markets.

34.     Marathon is able to increase the price of Summer RFG in Louisville and NKY: (1) without unbranded independent retailers turning to an alternative competitive source of supply located outside of Louisville and NKY; and (2) without manufacturers located outside of Louisville and NKY providing Louisville and NKY with significant substitute supply.  As articulated in the Horizontal Merger Guidelines issued by the Department of Justice and the Federal Trade Commission, the Herfindahl-Hirschman Index ("HHI") is a measure of market concentration. Market concentration is often one useful indicator of the level of competitive vigor in a market. The more concentrated a market, the more likely it is that there is a meaningful reduction in competition harming consumers.  Markets in which the HHI is between 1,500 and 2,500 points are considered to be moderately concentrated and markets in which the HHI is in excess of 2,500 points are considered to be highly concentrated.

35.     Upon information and belief, Kentucky's Summer RFG supply is manufactured primarily by Marathon, who has engaged in the business of refining, distributing, and selling approximately 95% of the Summer RFG in the Louisville and NKY market, during the relevant time-period. Thus, the Louisville and NKY wholesale supply for Summer RFG is highly concentrated with an HHI of up to over 9,000, as measured by the Horizontal Merger Guidelines.

36.     Marathon owns and operates the only refinery in the state, located in Catlettsburg, Kentucky.  There is only one refined products pipeline joined to this refinery.  Such pipelines are used to transport product among the states, but the refined products pipeline connected to this refinery leads directly out of the Commonwealth.

37.     Marathon also owns and operates a refinery in Robinson, Illinois, and that refinery has a refined products pipeline which transports product to Louisville, Kentucky, and a pipeline from Louisville to Lexington.  It can also transport product by pipeline from Robinson to Chicago, Illinois.

38.     The geographic market for RFG gasoline in Kentucky remains largely isolated from other sources of supply.  Marathon is uniquely situated to supply Summer RFG and other motor fuels to Louisville and NKY, with its pipeline access directly from Robinson to Louisville, and its Cattlesburg refinery in reasonable proximity for barging product downstream on the Ohio River. Moreover, as set forth further below due to the nature of these markets, including but not limited to the substantial investment required to construct a new refinery, the barriers to entry are high.  In furtherance of its monopoly over Summer RFG supply in Louisville and NKY, Marathon enters in to Exchange Agreements with its horizontal competitors, also refiners and wholesalers of gasoline.

39.     Upon information and belief, during the relevant time period, Marathon entered into Exchange Agreements with its major horizontal competitors, including, for example, ExxonMobil, Shell, and BP, for delivery of Summer RFG in Louisville and NKY, with the intent and purpose of limiting supply and minimizing competition in these markets.  Summer RFG, through use of these Exchange Agreements, coupled with its wholesale market dominance, Marathon maintained or attempted to maintain sufficient market power to limit the supply of Summer RFG and to raise the price at which it sells Summer RFG in Louisville and NKY to supracompetitive levels.

40.     Thus, Marathon's Summer RFG Exchange Agreements limit or attempt to limit supply options available to Kentucky gasoline retailers, depriving them of competitively priced

alternatives, thereby suppressing or attempting to suppress competition in Louisville and NKY, without any overarching competitive benefit.

### B. Supply Agreements with Unbranded Retailers Constrain Choice of Supplier.

41.    Kentucky consumers buy gasoline at retail stations throughout the state. Retail stations sell either branded or unbranded gasoline, and are referred to as branded or unbranded stations. Consumers' purchasing behavior can be generally characterized as motivated by brand loyalty or by price, among other factors. Unbranded stations generally market to consumers who are seeking the lowest price gasoline, rather than a particular brand. Under normal circumstances, unbranded stations generally have somewhat lower prices.  In part, because some brand-oriented consumers will substitute lower priced unbranded gasoline if the price difference between branded and unbranded becomes too great, unbranded gasoline is important to keep retail pricing competitive.  Unbranded retailers thus provide a competitive check on the pricing behavior of branded retailers.

42.    Unbranded stations purchase gasoline from Marathon and other wholesalers through supply agreements that can set prices based on formula (usually based on a reference Spot Market price) or based on a Rack Price, which is controlled solely by the wholesale seller that posts that Rack Price.

43.    Kroger and Swifty are unbranded retailers who have been among the largest purchasers of RFG from Marathon in the Louisville area. Their purchase contracts, as of 2008, required 100% of their listed monthly RFG amounts to be purchased from MPC, and provided penalties of 2 cents per gallon for each gallon of those amounts not purchased from Marathon.  In addition to the provisions cited above, the supply agreements discussed in the preceding paragraph

prohibited certain unbranded retailers, including Kroger and Swifty, from challenging Marathon's unilateral Rack Pricing decisions during times of limited supply (which is when unbranded wholesale prices are likely to be highest) through the following provision:

> [Swifty/Kroger] knows that MPC may use the Wholesale Reseller Price to manage customer liftings when MPC's Product Supply at a Terminal is limited and [Swifty/Kroger] waives the right to claim that this method of pricing is unfair, anti- competitive, tortious, or a breach of contract.

44.    As a result of this provision, the unbranded retailer cannot bring an antitrust claim against Marathon, which furthers Marathon's exercise of its monopoly power, as Marathon has removed an important safeguard in the marketplace.

### C. Marathon uses deed restrictions on real property to maintain its monopoly.

45.    Upon information and belief, during the relevant time-period, Marathon sold real property parcels throughout Kentucky that once maintained retail gasoline operations with deed restrictions that prohibited future gasoline sales and other conduct related to the sale of gasoline, *e.g.*, the operation of a convenience store.  Marathon specifically sold real property parcels in, at least, Fayette County, Boone County, Kenton County, and Jefferson County containing deed restrictions similar to the following:

> [Grantee] agrees that for a period of twenty-five (25) years from and after the date of this conveyance the Property shall not be used for a convenience store or for the sale, marketing, storage or advertising of petroleum fuels or motor oils, and that this restriction shall be a covenant running with the land and shall be contained in and made part of every deed, mortgage, lease or other instruction affecting title to the Property.

46.    Upon information and belief, during the relevant time period, Marathon, in conjunction with Speedway, sold real property parcels in Kentucky that once maintained retail

13

gasoline operations with deed restrictions that prohibited future gasoline sales and other conduct related to the sale of gasoline, *e.g.*, the operation of a convenience store, with the sole exception that motor fuels could be sold if they were:

> [T]he trademarked products of MARATHON PETROLEUM COMPANY LLC, its successors and assigns, or from a MARATHON branded Jobber and that the restriction shall be a covenant running with the land and shall be contained in and made a part of every deed, mortgage, lease or other instrument affecting the title to the premises.

47. Marathon's own corporate website unabashedly advertises its use of these deed restrictions. On a section of its corporate website titled "Real Estate," Marathon claims: "Marathon Petroleum Corporation (MPC) and its subsidiary companies, which include Speedway LLC, have approximately 280 properties for sale. These surplus properties are located in 13 states throughout the Midwest and Southeast." Marathon's corporate website continues, "Note most properties are subject to a possible 25-year petroleum deed restriction." When a viewer clicks on the "deed restriction" hyperlink, the or she is brought to text that reads:

> Most properties are offered for sale subject to a deed restriction prohibiting the sale of petroleum and tobacco products or operation of a convenience store for 25 years. A typical deed restriction states that, "Grantee agrees that for a period of twenty-five (25) years from and after the date of this conveyance, the premises shall not be used for a convenience store or for the sale, marketing, storage or advertising of petroleum fuels, motor oils or tobacco products, and that this restriction shall be a covenant running with the land and shall be contained in and made a part of every deed, mortgage, lease or other instrument affecting the title to said premises."

48. These aforementioned deed restrictions represent contracts in restraint of trade. The deed restrictions produced adverse, anticompetitive effects within the retail gasoline market by reducing the amount of suitable properties favorably located for competing retail gasoline stations in Kentucky for the retail sale of gasoline. This limitation on new entrants to the retail marketplace:

14

(i) furthers Marathon's control over the wholesale marketplace because the fewer retail outlets within the State lessens the likelihood of other distributors seeking to enter the market; (ii) strengthens Marathon-owned retail locations as they ultimately face less competition than would be otherwise found in the absence of these deed restrictions; and (iii) supports Marathon's ability to control the retail price of gas in the Commonwealth of Kentucky and the sale of RFG in Louisville and NKY.

49.     Marathon imposed the deed restrictions with the intent and purpose of limiting the retail gasoline market and/or keeping other branded and unbranded gasoline out of that market for its own gain, including for the benefit of its Speedway stations.

50.     Marathon's practice of including the deed restrictions discussed above in sales of retail gasoline stations is unfair and unconscionable.  The deed restrictions at issue did not, nor were they intended to, serve any legitimate procompetitive purpose.

## MARATHON'S PRACTICES LEAD TO LESS COMPETITION AND HIGHER PRICES

51.     As a result of Marathon's monopoly power, coupled with the anticompetitive agreements set forth herein, wholesale and retail prices of gasoline have been dramatically higher than  in a comparable competitive market.  For example, for the period of May 1, 2014 through August 31, 2014, the wholesale Rack Price for regular grade RFG in Louisville averaged $0.23 higher for unbranded sales and $0.25 higher per gallon for branded sales compared to similar products sold in St. Louis, and $0.27 and $0.26 cents higher respectively in Baltimore.

52.     Above and beyond these averages, at certain times in 2014, the price differential between Louisville and St. Louis reached $0.49 and $0.40 cents per gallon for unbranded and

branded sales respectively.   Similarly, the price differential between Louisville and Baltimore reached $0.60 and $0.39 cents for unbranded and branded sales respectively.

53.     As a result of Marathon's excessive wholesale prices, retail prices have been inflated as well.  For example, for the period of May 1, 2014 through August 31, 2014, the retail price for regular grade gasoline in Louisville, not including tax, averaged $0.19and $0.17 cents higher per gallon[1] than the average price paid respectively in St. Louis and Baltimore over the same time period.

### VIOLATIONS ALLEGED

### COUNT 1
### Violation of the Sherman Act
### 15 U.S.C. § 1

54.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

55.     Marathon's use of Exchange Agreements, supply agreements, and deed restrictions unreasonably restrain trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

56.     Marathon's use of Exchange Agreements with its horizontal competitors, in light of its dominant market position, the highly concentrated market structure, the anticompetitive market effects and the lack of potential justifications, dissuade horizontal competition from entering the relevant product market and constitute are unreasonable restraints of trade.

---

[1] These price comparisons reflect all types of retail gasoline sold in these markets including both conventional and Summer RFG and thus understate the true differential for Summer RFG.

57.     Marathon's use of supply agreements that require unbranded retailers to waive defenses to anticompetitive conduct, combined with its dominant market position, the highly concentrated market structure, the history of these restraints, anticompetitive market effects and lack of potential justifications, are unreasonable restraints of trade.

58.     Marathon's use of deed restrictions that preclude the use of real property as a retail gasoline station, combined with its dominant market position, the highly concentrated market structure, the history of these restraints, anticompetitive market effects and lack of potential justifications, are unreasonable restraints of trade.

59.     Marathon exercised market power through these deed restrictions, supply agreements, and exchange agreements, and used this market power to control supply, elevate prices, and exclude competition.

60.     Marathon's Exchange Agreements, supply agreements and deed restrictions, have had the effect of raising, maintaining, and stabilizing at artificially high levels wholesale and retail prices for both conventional and Summer RFG .

61.     By using Exchange Agreements, supply agreements, and deed restrictions, Marathon contracted, combined in the form of trust or otherwise, or conspired in restraint of trade or commerce among the several States in violation of 15 U.S.C. § 1.

**COUNT 2**
**Violation of the Sherman Act**
**15 U.S.C. § 2**

62.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

63.     By employing Exchange Agreements, supply agreements and deed restrictions, Marathon monopolized, attempted to monopolize, or combined or conspired with any other person

17

or persons, to monopolize or attempted to monopolize any part of the trade or commerce among the several States, or with foreign nations, in violation of 15 U.S.C. § 2.

## COUNT 3
### Violation of the Clayton Act
### 15 U.S.C. § 14

64.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

65.     By using Exchange Agreements and supply agreements, Marathon engaged in commerce, in the course of such commerce, leased or made a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States, or fixed a price charged therefor, or discounted from, or rebated upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding was to substantially lessen competition or tend to create a monopoly in any line of commerce, in violation of 15 U.S.C. § 14.

## COUNT 4
### Violation of the Kentucky Consumer Protection Act
### KRS 367.175(1)

66.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

67.     By employing Exchange Agreements, supply agreements and deed restrictions, as described above, Marathon contracted, combined in the form of trust and otherwise, or conspired in restraint of trade or commerce in this Commonwealth, in violation of KRS 367.175(1).

18

**COUNT 5**
**Violation of the Kentucky Consumer Protection Act**
**KRS 367.175(2)**

68.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

69.     By employing Exchange Agreements, supply agreements and deed restrictions, as described above, Marathon monopolized, attempted to monopolize, or combined or conspired with any other person or persons to monopolize or attempt to monopolize a part of the trade or commerce in this Commonwealth, in violation of KRS 367.175(2).

**COUNT  6**
**Violation of the Kentucky Consumer Protection Act**
**KRS 367.170(1)**

70.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

71.     By employing Exchange Agreements, supply agreements and deed restrictions, as described above, Marathon engaged in unfair, false, misleading, or deceptive acts or practices in the conduct of trade or commerce in violation of KRS 367.170(1).

**REQUESTED RELIEF**

**WHEREFORE**, the Commonwealth of Kentucky, by and through Attorney General Andy Beshear, prays that final judgment be entered against Marathon declaring, ordering, and adjudging that:

72.     Marathon's Exchange Agreements, supply agreements, and deed restrictions, unreasonably restrain trade and are illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1;

73.     Marathon's Exchange Agreements, supply agreements, and deed restrictions, unreasonably restrained trade through monopolization or attempted monopolization, which is illegal

19

under Section 2 of the Sherman Act, 15 U.S.C. § 2;

74.     Marathon's Exchange Agreements and supply agreements are acts in commerce where the effect was to substantially lessen competition or tend to create a monopoly in any line of commerce, which is illegal under the Clayton Act, 15 U.S.C. § 14;

75.     Marathon's Exchange Agreements, supply agreements and  deed restrictions, unreasonably restrain trade and are illegal under KRS 367.175(1);

76.     As a result of Marathon's use of the aforesaid Exchange Agreements, supply agreements and deed restrictions, Marathon unreasonably restrained trade through monopolization or attempted monopolization, which is illegal under KRS 367.175(2);

77.     Marathon's Exchange Agreements, supply agreements and deed restrictions, are unfair, false, misleading, or deceptive acts or practices in the conduct of trade or commerce, and they are illegal under KRS 367.170(1);

78.     Marathon permanently enjoined from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out, or renew the  anticompetitive practices set forth in the aforesaid deed restrictions, supply agreements and Exchange Agreements, or any other agreement having similar purposes or effects in violation of 15 U.S.C. §§ 1-2, 14; KRS 367.170(1) & 367.175(1)-(2);

79.     That Plaintiff recover damages, as provided by the law, and the amount of such damages be trebled;

80.     That Marathon be Ordered to pay a civil penalty in the amount of $2,000.00 for each willful violation of KRS 367.170(1);

81.     That Marathon be Ordered to pay restitution for any willful violation of KRS

367.170(1), in an amount to be determined at trial;

82. That Marathon be Ordered to make restitution to the Commonwealth due to Marathon's unfair competition, including disgorgement of wrongfully-obtained revenues, earnings, profits, compensation, and benefits;

83. Grant the Commonwealth, pursuant to 15 U.S.C. § 15c(a)(2) and 15 U.S.C. § 26, its attorney's fees to be paid by Marathon; and

84. Grant such other relief as may be determined to be in the public interest in order to preserve a procompetitive market for motor fuels in the Commonwealth of Kentucky.

Dated:  November 7, 2017                          Respectfully submitted,

                                                 ANDY BESHEAR,
                                                 ATTORNEY GENERAL


                                                   /s/Andrew G Downey
                                                 Assistant Attorney General

                                                 Elizabeth Ungar Natter
                                                 Assistant Attorney General
                                                 Benjamin Long
                                                 Executive Director
                                                 Andrew G. Downey
                                                 Assistant Attorney General
                                                 Office of Consumer Protection
                                                 Office of the Attorney General
                                                 1024 Capital Center Drive
                                                 Frankfort, KY  40601
                                                 Ph:  502-696-5300


                                                 BOIES SCHILLER FLEXNER LLP
                                                 Nicholas A. Gravante, Jr.
                                                 (ngravante@bsfllp.com)

575 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-2300
Fax:  (212) 4466-2350

Helen M. Maher (hmaher@bsfllp.com)
333 Main Street
Armonk, New York 10504
Telephone:  (914) 749-8200
Fax:  (914) 749-8300

Michael I. Endler (mendler@bsfllp.com)
30 South Pearl Street
11th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Facsimile: (518) 434-0665

Ron Parry
STRAUSS TROY
The Federal Reserve Building
150 East Fourth Street
Fourth Floor
Cincinnati, Ohio 45202-4018

*Attorneys for Plaintiff*
*Commonwealth of Kentucky*