UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

COMMONWEALTH OF KENTUCKY,                                          Plaintiff,

v.                                              Civil Action No. 3:15-cv-354-DJH-CHL

MARATHON PETROLEUM COMPANY
LP et al.,                                                       Defendants.

* * * * *

## MEMORANDUM OPINION AND ORDER

The Commonwealth of Kentucky alleges that Defendants Marathon Petroleum Corporation, Marathon LP, and Speedway LLC violated federal antitrust laws by overcharging consumers for gasoline.  (Docket No. 88)  Marathon Petroleum Corporation asserts that the Court may not exercise personal jurisdiction over it and moves for summary judgment on that ground.  (D.N. 156)  Following oral argument, the Court directed the parties to file supplemental briefs addressing the impact of the Clayton Act's nationwide service-of-process provision on the Court's jurisdiction over Marathon Petroleum Corporation.  (D.N. 224)  For the reasons stated below, the Court finds that it has personal jurisdiction over Marathon Petroleum Corporation and will therefore deny Marathon Petroleum Corporation's motion for summary judgment on personal-jurisdiction grounds.  The Court will, however, grant Defendants' motion to exclude the Commonwealth's expert witness, Dr. Michael Sattinger (D.N. 191), and therefore also grant Defendants' motion for summary judgment on the merits.  (D.N. 195)

**I.**

The factual background is nearly unchanged since the Court's ruling on Marathon Petroleum Corporation's motion to dismiss (D.N. 147); thus, only a brief summary of the facts is necessary here.

1

Marathon Petroleum Corporation, together with its subsidiaries Marathon LP and Speedway LLC, is one of the largest petroleum-product refiners, marketers, and transporters in the United States.  (D.N. 88, PageID # 1093)  "Marathon" is the largest refiner in the Midwest and owns the only refinery in Kentucky.  (*Id.*, PageID # 1089)  It is also the largest gasoline supplier in Kentucky and largest reformulated gasoline (RFG) supplier in Louisville and Northern Kentucky.  (*Id.*)

The Commonwealth claims that Marathon's market share "has allowed [Marathon] to illegally manipulate and attempt to manipulate the market for RFG in . . . Louisville and [Northern Kentucky] (hereinafter "LNK.")."  (*Id.*)  Specifically, the Commonwealth contends that Marathon maintains its market dominance through a variety of contractual arrangements, including the anticompetitive use of specialized supply agreements known as exchange agreements.  (*See* D.N. 147 (summarizing the practices the Commonwealth alleges violate antitrust law); *see also infra*, Part III.B., for detailed definition of exchange agreements)  As a result of these practices, the Commonwealth asserts, Marathon has caused the wholesale and retail prices of RFG to be substantially higher in Kentucky than those found in comparative competitive markets.  (*Id.*, PageID # 1101)

The Commonwealth filed this suit against Marathon LP on May 12, 2015, alleging violations of the Sherman Antitrust Act and the Clayton Act.  (D.N. 1)  On November 7, 2017, the Commonwealth amended its complaint to add Marathon Petroleum Corporation and Speedway, LLC as defendants, invoking the Clayton Act.  (D.N. 88)  Marathon Petroleum Corporation moved to dismiss for lack of personal jurisdiction and failure to state a claim.  (D.N. 92)  Marathon Petroleum Corporation's personal-jurisdiction argument hinged on the company's allegedly insufficient contacts with the forum state.  Marathon Petroleum Corporation claimed that as a

parent corporation it has no direct connections with Kentucky and that Kentucky's long-arm statute thus does not allow this Court to exercise jurisdiction over Marathon Petroleum Corporation.  The Court denied the motion to dismiss.  (D.N. 147)  Marathon Petroleum Corporation now seeks summary judgment, again arguing that it lacks the necessary contacts with the forum state.  (D.N. 156)

The Court heard oral argument on the motion for summary judgment on October 18, 2019. (D.N. 224)  After the hearing, the Court directed the parties to file supplemental briefs addressing the application of 15 U.S.C. § 22 and the Sixth Circuit's holding in *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012), to the parties' positions on personal jurisdiction.  (D.N. 224) Specifically, the Court asked the parties to address whether personal jurisdiction was proper in this action anywhere within the United States because of the Clayton Act's national service-of-process provision.  *See Carrier Corp.*, 673 F.3d at 449–50 (holding that under the Clayton Act, "personal jurisdiction exists whenever the defendant has 'sufficient minimum contacts with the United States' to satisfy the due process requirements under the Fifth Amendment"); *see also In re Auto. Refinishing Paint Antitrust Litig*., 358 F.3d 288, 297–98 (3d Cir. 2004) (finding that nationwide service of process is appropriate under the Clayton Act if the defendant has sufficient minimum contacts with the United States).  In its supplemental brief, Marathon Petroleum Corporation argues for the first time that venue in the Western District of Kentucky is improper under the Clayton Act, and that proper venue is a prerequisite to application of the nationwide service-of-process provision addressed in *Carrier*.  (D.N. 228)  Neither party addressed venue in its briefs on the motion for summary judgment, so the Court bases its conclusions on the legal arguments presented in the post-hearing briefs.

3

**II.**

**A.    Clayton Act**

Because the Court must decide whether it can exercise personal jurisdiction over Marathon

Petroleum Corporation before it may rule on the substantive motions, the Court will consider

Marathon's motion for summary judgment on personal jurisdiction first.

Marathon argues that for the Clayton Act's nationwide service-of-process provision to

apply, the Act's venue provision must also be satisfied.  The Clayton Act prohibits numerous

business practices that can result in antitrust injury to consumers.  Both the nationwide service-of-

process provision discussed above and the Clayton Act's venue provision are found in 15 U.S.C.

§ 22, which states:

> Any suit, action or proceeding under the antitrust laws against a corporation may
> be brought not only in the judicial district whereof it is an inhabitant, but also in
> any district wherein it may be found or transacts business [venue provision]; and
> all process in such cases may be served in the district of which it is an inhabitant,
> or wherever it may be found [nationwide service-of-process provision].

15 U.S.C. § 22.

In their post-hearing briefs, the parties focus on the circuit split regarding whether the

venue and service-of-process provisions of the Clayton Act should be read together or separately—

i.e., whether the provisions are "coupled" or "decoupled" for purposes of statutory interpretation.

Marathon argues that the provisions must be read together and that because the Commonwealth

cannot establish *venue* under the Clayton Act, the nationwide service-of-process provision is

irrelevant and the case must be dismissed for lack of personal jurisdiction.  (D.N. 228, PageID #

15232 (citing *KM Enter., Inc. v. Glob. Traffic Techs., Inc*., 725 F.3d 718, 733–34 (7th Cir. 2013)

(holding that venue and service provisions of the Clayton Act must be read together)).)  The

Commonwealth argues that the venue and service-of-process provisions of the Clayton Act can be

read separately and that the Court may exercise personal jurisdiction over Marathon Petroleum

4

Corporation via the Clayton Act's service-of-process provision because venue is appropriate under the general venue statute, 28 U.S.C. § 1391.  (D.N. 231, PageID # 15261 (citing *Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1408 (9th Cir. 1989) (holding that the venue and service provisions of the Clayton Act may be considered separately)))  The Sixth Circuit has not yet considered this discrete question.  And district courts in the circuit are, as noted by the parties, divided on the issue.  *Compare Hyland v. Homeservices of Am., Inc.*, No. 3:05-cv-612-R, 2007 WL 1959158 (W.D. Ky. June 28, 2007) (finding "proper venue is still required in order to confer personal jurisdiction" under the Clayton Act), *with Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 410 F. Supp. 2d 592, 601 (E.D. Ky. 2006) (adopting reasoning of *Go-Video* and decoupling Clayton Act's service-of-process and venue provisions).  The Court need not weigh the competing approaches here, because as explained below, Marathon Petroleum Corporation waived any challenge to venue by not raising it in its first affirmative pleading.

## B.    **Waiver of Venue**

"Unlike jurisdictional defects, venue objections can be waived."  *Al-Muhaymin v. Jones*, 895 F.2d 1147, 1149 (6th Cir. 1990).  Federal Rule of Civil Procedure 12(h)(1) provides:

> A party waives any defense listed in Rule 12(b)(2)-(5) by:
> (A) omitting it from a motion in the circumstances described in Rule 12(g)(2); or
> (B) failing to either:
> (i) make it by motion under this rule; or
> (ii) include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1)
> as a matter of course.

Rule 12(b)(3) covers the defense of improper venue.  A party must therefore raise venue in its first responsive pleading, or else that defense is waived.  *See Whittington v. Milby*, 928 F.2d 188, 192 (6th Cir. 1991) ("It is true that improper venue is a personal defense which is waived if not raised either by motion or in a responsive pleading."); *see also Palazzo v. Harvey*, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019) ("Generally speaking, arguments raised for the first time in reply briefs

are waived, and this applies both on appeal, *American Family Prepaid Legal Corp. v. Columbus Bar* [*Ass'n*], 498 F.3d 328, 335 (6th Cir. 2007), and to summary judgment motions filed in the trial court, *Ryan v. Hazel Park*, 279 F. App'x 335, 339 (6th Cir. 2008).").  This rule applies equally in actions brought under the Clayton Act.  *See KM Enter.*, 725 F.3d at 733–34 (discussing theory of waiver of venue in antitrust case); *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1237 n.3 (6th Cir. 1981) (declining to address relationship between Clayton Act's venue and service-of-process provisions given defendant's waiver of objections to venue and service of process in the district court).

Marathon Petroleum Corporation's first responsive pleading was a motion to dismiss for lack of personal jurisdiction and failure to state a claim.  (D.N. 92)  Following the Court's denial of that motion, Marathon Petroleum Corporation moved for summary judgment, again on personal-jurisdiction grounds.  (D.N. 156)  In both the motion to dismiss and the first motion for summary judgment, Marathon Petroleum Corporation's personal-jurisdiction argument turned on whether the company had the requisite minimum contacts with Kentucky to satisfy the Commonwealth's long-arm statute.  Marathon Petroleum Corporation raised no venue argument in either motion.   In its post-hearing supplemental brief, however, Marathon Petroleum Corporation shifted its focus from the Clayton Act's nationwide service-of-process provision to the Act's venue provision, arguing for the first time that venue is improper in the Western District of Kentucky under the Clayton Act.  (D.N. 228, PageID # 15232)

Waiver is clearly established when an issue was not raised in the first responsive pleading. *See King v. Taylor*, 694 F.3d 650, 660 (6th Cir. 2012) (holding that "forfeiture . . . was . . . clear" where, "[a]fter including the service defense in his answer, [defendant] was completely silent about it until the summary judgment stage"); *Whittington*, 928 F.2d at 192.  The Sixth Circuit has

addressed a similar scenario in the antitrust context and concluded that the defendant waived the defense of improper venue. In *Chrysler Corp.*, the defendant argued that the nationwide "service of process provision in the second clause of [§] 12 is available only when the forum contact requirements of the first clause are met." 643 F.2d at 1237 n.3. But the Sixth Circuit found that it "need not decide this question because . . . failure to object to service of process or venue in [the defendant's] Rule 12(b) motion below constitutes a waiver of any such objection here." *Id*. The Sixth Circuit thus declined to address the circuit split as to whether the Clayton Act's venue and service-of-process provisions should be coupled because the defendant waived the defense of improper venue. *Id*; *see also Daniel v. Am. Bd. of Emergency Med.*, No. 90-CV-1086A, 1997 WL 785635, at *2 (W.D.N.Y. Nov. 19, 1997) (holding that because defendants in Clayton Act case "failed to raise their venue defense in their original pleadings with the court, they have waived the defense and cannot now raise it"); *cf. KM Enter.*, 725 F.3d at 733–34 (discussing possibility of defendant's waiver-of-venue argument, but finding that venue had not been waived).

In sum, the Court finds that Marathon Petroleum Corporation waived any challenge to venue by failing to assert the defense in either of its first two substantive motions. Because the challenge to venue has been waived, Marathon Petroleum Corporation's challenge to the Court's personal jurisdiction fails. Summary judgment on personal-jurisdiction grounds is therefore inappropriate.

## III.

Because the Court may exercise personal jurisdiction over Marathon Petroleum Corporation, it will next consider the motion of all three defendants (Marathon Petroleum Corporation, Marathon LP, and Speedway) to exclude the Commonwealth's only expert witness, Dr. Michael Sattinger. (D.N. 191)

District courts serve as gatekeepers for admission of expert-witness testimony and must exclude "expert testimony that is unreliable and irrelevant." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (citing *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001)). The Court's analysis is guided by the principles set forth in Federal Rule of Evidence 702, which provides that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The main goal of the admissibility inquiry is "to determine whether the evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 915 (6th Cir. 2009) (citing *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993)). With respect to the admissibility determination, *Daubert* "provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). The *Daubert* factors include "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 593–94). Although the factors are not a "definitive checklist or test," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999), they can guide a court's inquiry "where they are reasonable measures of the reliability of expert testimony." *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001). Determining reliability and relevance does not require a court to evaluate the accuracy of an expert's opinion—a task reserved for the jury—but rather requires the Court "to determine

whether [the expert's testimony] rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In Re Scrap Metal*, 527 F.3d at 529–30.

Defendants move to exclude the Commonwealth's expert, Dr. Michael Sattinger.[1] (D.N. 191)  Defendants do not attack Sattinger's qualifications but argue that the methodology he employed to reach his conclusions regarding the relevant market, the existence of antitrust injury, and the amount of damages was technically deficient and renders his opinion unreliable, irrelevant, and inadmissible.  (*Id.*)  After careful consideration of the record, the Court agrees and will exclude Sattinger's testimony on these topics for the reasons detailed below.

## A.    Relevant Market

An antitrust plaintiff bears the burden to "define the relevant market within which the alleged anticompetitive effects of the defendant's actions occur." *Worldwide Basketball & Sport Tours v. Nat'l Coll. Athletic Ass'n*, 388 F.3d 955, 962 (6th Cir. 2004).  The relevant market contains "both a geographic component and a product component," *Ky. Speedway*, 588 F.3d at 916, and is defined by "commodities reasonably interchangeable by consumers for the same purposes [that] make up that part of the trade or commerce, monopolization of which may be illegal." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  The Sixth Circuit applies the reasonable-interchangeability standard to define the relevant market.   The reasonable-interchangeability standard relies on "(1) product uses (whether substitute products can perform the same function) and/or (2) consumer response (also known as 'cross-elasticity'), defined as 'consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service.'" *Ky. Speedway*, 588 F.3d at 917 (quoting *Worldwide Basketball & Sport Tours*, 388 F.3d

---

[1] Defendants requested oral argument on their motion to exclude Sattinger's testimony.  (D.N. 212, PageID # 13591)  Because the issue has been thoroughly briefed following extensive discovery and the parties' arguments are fully developed, the Court finds oral argument unnecessary. Defendants' request for oral argument will therefore be denied.

at 961).  "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim."  *NHL Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719–20 (6th Cir. 2003); *see also* ABA Section of Antitrust Law, Antitrust Law Developments, 629 (8th ed. 2017) ("[M]any [courts] have found the lack of sufficient expert testimony supporting or refuting a proposed market to be fatal.") (citations omitted).

The Commonwealth alleges that Marathon LP and Marathon Petroleum Corporation monopolized the wholesale market for Summer RFG, a special type of gasoline that gas stations must sell during the summer in certain parts of Kentucky  *See* 42 U.S.C. § 7545(k)(6)(A).  (D.N. 88, PageID # 1090)  Reformulated blendstock for oxygenate blending (RBOB) is a type of gasoline that serves as the active and necessary ingredient of RFG.  (D.N. 203-3, PageID # 12579)  RFG, however, cannot be shipped in its final state for practical reasons, so RBOB is blended with ethanol at terminals—docking stations that receive shipments of raw petroleum products—to create RFG. (*Id.*, PageID # 12580)  That RFG is then sold to retailers for sale to the ultimate consumer at the gas station.  (*Id.*)  The crux of the Commonwealth's argument is that Marathon dominates the wholesale RFG market because it controls the influx of RBOB, allowing it to monopolize the market for retail RFG, a downstream product of RBOB.  (D.N. 203-3, PageID # 12576)  The "consumers" in this market are therefore retailers of RFG, such as Kroger and Valero, that either buy or self-supply RFG from terminals.  Sattinger determined that "at the wholesale level, the terminals where RFG is sold constitute the relevant geographic market for Summer RFG."  (D.N. 203-3, PageID # 12596)  He further limited the geographic market to terminals located in Kentucky.  (*Id.*)  Thus, the geographic market defined by Sattinger consists solely of terminals in Kentucky that blend RBOB to produce and then sell Summer RFG.

Sattinger's report fails to identify a reliable geographic market.  The market Sattinger defined suffers from two fatal shortcomings.  First, Sattinger did not explain his methodology for defining the relevant market.  Generally, to define a relevant market, economists employ the hypothetical-monopolist test, also known as the SSNIP[2] test, a widely used device that allows analysts to determine whether customers would leave the market in response to a "small but significant non-transitory increase in price," usually using a five percent increase.  *See Ky. Speedway*, 588 F.3d at 918 (citing *FTS v. Whole Foods Mkt., Inc*., 548 F.3d 1028, 1038 (D.C. Cir. 2008) (finding that SSNIP test is an admissible tool for defining relevant market)).  If customers leave the market in response, the market is defined too narrowly.  *See In Re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277 (6th Cir. 2014) (acknowledging that SSNIP typically utilizes a 5% price increase).

Although Sattinger acknowledged that the hypothetical-monopolist test "provides a guide" to defining a relevant market (D.N. 203-3, PageID # 12594 (citing Merger Guidelines, Section 4.1)), he did not employ it here.  (D.N. 191-4, PageID # 7924)  While a relevant market can be defined without the use of the SSNIP test, Sattinger is nonetheless required to root his conclusions in a reliable methodology.  *See Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, No. 5:11-CV-1755, 2015 WL 6082122, at *8 (N.D. Ohio Sept. 30, 2015) (finding expert analysis reliable despite absence of SSNIP test because expert "utilized a different, still-reliable statistical method to determine the relevant product market"); *Encana Oil & Gas, Inc. v. Zaremba Family Farms, Inc.*, No. 1:12-cv-369, 2015 WL 12883545 (E.D. Mich. Sept. 18, 2015) (holding expert testimony

---

[2] "Specifically, the [hypothetical monopolist] test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ("hypothetical monopolist") likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market."  Horizontal Merger Guidelines, U.S. Dept of Justice and FTC, Section 4.1.1, August 19, 2010 (hereinafter "Merger Guidelines").

admissible where expert employed an economic analysis other than SSNIP test to define relevant market).  Yet Sattinger's report contains no explanation for why he chose to limit the market to terminals in Kentucky.  (*See* D.N. 203-3)  In the absence of an alternative, but "still-reliable statistical method to determine the relevant product market," *Universal Surveillance*, 2015 WL 6082122, and considering the additional deficiencies discussed below, the Court concludes that the market Sattinger proposes lacks the "objective, independent validation of methodology" that is required for admissibility. *Vaughan v. Konecranes, Inc*., 642 F. App'x 568, 577 (6th Cir. 2016); *see also Ky. Speedway*, 588 F.3d at 919 (excluding expert testimony in antitrust case because expert used unreliable methodology to define a relevant market).

Second, even if the Commonwealth had demonstrated that Sattinger defined his market using a reliable method, his opinion would still be excluded because his proposed market does not reflect the economic realities of the wholesale RFG market.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 336–37 (1962) (holding that the relevant market must "correspond to the commercial realities of the industry and be economically significant").  Marathon LP and its competitors must ship RBOB, a necessary component of RFG, into terminals in the Commonwealth.  Yet Sattinger's proposed geographic market fails to consider where Marathon's competitors could "practicably turn for [RBOB]." *Tampa Elec. Co. v. Nashville Coal Co*., 365 U.S. 320, 327 (1961); *see also* Merger Guidelines § 4.2.1, 4.2.2, 5.1 (stating that geographic markets must include competitors and that "firms that clearly possess the necessary assets to supply into the relevant market rapidly" must be considered part of the geographic market).  Determining where market participants can practicably turn for supplies requires a fact-intensive inquiry that includes "considerations of areas where products are marketed, or where the defendant perceives that it is competing; any applicable regulatory standards; transportation costs and challenges such as risk of spoilage, size, or weight;

and 'other factors bearing upon where customers might realistically look to buy the product.'" *In re Se. Milk*, 739 F.3d at 277 (quoting *E.I. du Pont de Nemours & Comp. v. Kolon Indus., Inc.*, 637 F.3d 435, 442–43 (4th Cir.2011) (internal citations omitted)).

Sattinger limited the geographic market to terminals in Kentucky.  But he failed to explain why he excluded the sources of RBOB from his market.  For example, Valero, Marathon's only competitor for RFG, self-supplied RBOB from its refinery in Louisiana to supplement its supply of RFG available for sale in Louisville.  (D.N. 191, PageID # 7888)  Indeed, Sattinger noted in his report that Valero "received RBOB [at its Louisville terminal] from its Memphis, St. Charles, and Meraux refineries by barge on the Mississippi and Ohio Rivers."  (D.N. 203-3, PageID # 12586)  Further, Marathon has submitted evidence demonstrating that both Kroger and Marathon LP have trucked in supplemental sources of RBOB from terminals in the Chicago and St. Louis areas. (D.N. 212, PageID # 13604–05)  Without explanation, Sattinger dismisses this evidence in his rebuttal report as "anecdotal" and thus irrelevant.  (D.N. 191-11, PageID # 8105)  But this evidence establishes that not only could wholesale customers turn to sources of RBOB from refineries well outside of the proposed geographic market, they *already have*.  By failing to include "reasonably interchangeable" sources of RBOB, the necessary precursor for RFG, Sattinger's geographic market is rendered unreliable. *See Worldwide Basketball & Sport Tours*, 388 F.3d at 961.

Without relying on an established methodology, and while excluding sources of supply already used by competitors in the wholesale market, Sattinger defined a geographic market that is "connected to existing data only by the *ipse dixit* of the expert" and does not meet the admissibility requirements of *Daubert*.  *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see* Black's Law Dictionary (11th ed. 2019) (defining "ipse dixit" as "[s]omething asserted but not proved").  The

geographic market defined by Sattinger is therefore unreliable and cannot be used to calculate market share or demonstrate market dominance. *See Worldwide Basketball & Sport Tours*, 388 F.3d at 963 (holding that antitrust claim must be dismissed because plaintiff's expert failed to define a relevant market through reliable means).

**B.     Antitrust Injury**

Sattinger's opinion must also be excluded because it fails to establish a connection between Defendants' allegedly anticompetitive behavior and harm to consumers.  Sattinger employed a yardstick approach—a straightforward comparison—to calculate $173.6 million in damages. (D.N. 203-3, PageID # 12563)  To reach this figure, he compared the markets for RFG in Baltimore and St. Louis to the LNK market.  (*Id.*)  Sattinger analyzed the market prices of RFG across the cities, accounting for discounts that Marathon allegedly provided its wholesale customers, and then attributed the difference in price to anticompetitive conduct by Defendants.  (D.N. 203-3, PageID # 12620–21)  He multiplied that price differential by the relevant time period to arrive at his damages figure, assuming that the difference in price was attributable to the alleged wrongdoing of the defendants.  (*Id.*, PageID # 12688)  According to Sattinger, St. Louis and Baltimore were appropriate comparison cities because they represented competitive markets for RFG with a substantial number of wholesale customers.  (D.N. 203-3, PageID # 12617)  He also testified in his deposition that the two cities had been chosen for him before he ran any analysis. (D.N. 212-1, PageID # 13608)

A yardstick approach is one way that an expert can calculate antitrust damages.  The approach requires the expert to analyze the differences in the price of the product at issue among meaningfully comparable markets, firms, or locations.  It is typically used when comparing profitability between similar firms, *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 851–52

(5th Cir. 2015) (analyzing how comparable yardsticks must be), or to compare profit margins within the same company in differently situated markets. *See Conwood Co.*, 290 F.3d at 794 (finding that yardstick approach was appropriately employed by expert to compare the defendant's profits across two different tobacco markets). Expert opinions based on the yardstick approach may be admissible when the approach is properly applied. *See, e.g.*, *id.* Successful applications of this approach usually employ a regression analysis. A regression analysis is a basic statistical tool "useful in quantifying the relationship between a dependent variable [e.g., the price of Summer RFG] and independent variables [e.g., demand for gasoline and population size]." *In Re Se. Milk*, 739 F.3d at 285 (citing *Wiesfeld v. Sun Chemical Corp.*, 84 F. App'x 257, 261 n.3 (3d. Cir. 2004)).

To be meaningful, the yardsticks to be compared must be the same length. *See Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 208 (5th Cir. 2000) (finding that expert testimony could not support a jury verdict where the expert's yardsticks were not nearly identical and he offered no evidence of the comparison markets' geographic locations, sizes, markets served, or costs of operation). The Seventh Circuit found that expert testimony was inadmissible for failing to control for the length of yardsticks in *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588 (7th Cir. 1998). There, Judge Posner deemed "worthless" expert reports that compared damages between the antitrust defendant's clinics and other providers in the area but failed to control for any factors except the mix of drugs provided. *Id.* at 593. Without any sort of regression analysis to "correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining," Judge Posner concluded, expert reports "do not provide a rational basis for a judgment." *Id.* The expert opinion at issue in *Marshfield Clinic* was therefore excluded because the "evidence [was] not probative because it omitted the major variables," rendering it a

"'regression[] so incomplete as to be inadmissible as irrelevant.'"  *Bickerstaff v. Vassar College*, 196 F.3d 435, 449 (2d Cir. 1999) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986)).

By contrast, the Sixth Circuit found in *Conwood Co.* that the plaintiff's expert testimony that relied upon a yardstick approach was admissible.  290 F.3d 768.  There, the expert employed "regression analyses, a yardstick test and a before-and-after test" to establish antitrust damages. *Id.* at 793.  The court analyzed the expert's report and found it sufficiently reliable because the expert "ruled out the possibility that the statistical relationship was caused by factors other than [the defendant's] conduct" and "examined the possible explanations that [the defendant's] own expert suggested" by using regression analyses.  *Id.*

Here, Sattinger merely compared LNK to Baltimore and St. Louis, subtracted the discounts given by Marathon to its retailers, and then concluded that the difference in price must be attributable to anticompetitive conduct by Defendants.  (D.N. 203-3, PageID # 12620–21)  This application of the yardstick approach is fundamentally flawed for three reasons.  First, Sattinger testified that "there could be other factors," besides Defendants' conduct, that "could add [to] the difference or reduce the difference" in price of RFG between the comparison cities.  (D.N. 191-4, PageID # 7947–48)  Those factors included population size, number of automobile drivers, and geographic proximity to different sources of supply.  (D.N. 191-4, PageID # 7917–19, 7924). Sattinger conceded that he did not control for those factors among the cities, although he acknowledged the existence of fundamental differences in both supply and demand and population size in his report.  (D.N. 203-3, PageID # 12620; D.N. 191-4, PageID # 7948)

In *Conwood*, the Sixth Circuit found "particularly relevant the undisputed evidence" that the plaintiff's expert controlled for the other factors that could have explained the price differences

using regression analyses.  290 F.3d at 793.  Here, Sattinger failed to account for even the most salient differences among the comparison cities:

> Q:      [D]id you make any comparisons of the population between Baltimore and the populations in the Kentucky markets? . . .
> A       I do not see a comparison population in the report.  It's possible that others have looked at the populations.  But that is not included in the report. . . .
> Q:      Did you make any comparisons about the demand characteristics of Summer RFG in Baltimore Versus the Kentucky areas?
> A:      No. . . .
> Q:      Did you make any analysis of the – anything relating to traffic of vehicles using gasoline in Baltimore vs. Kentucky?
> A:      No, I did not.

(D.N. 191-4, PageID # 7917–19; 7924)

To be reliable and thus admissible, Sattinger's application of the yardstick approach would need to follow established methodology and control for the major differences among the cities that could impact the market price for RFG.  *See The Iams Co. v. Nutro Prod., Inc*., No. 3:00-CV-566, 2004 WL 5496244, at *6 (S.D. Ohio June 30, 2004), *on reconsideration sub nom. Iams Co. v. Nutro Prod., Inc*., No. 3:00-CV-566, 2004 WL 5831566 (S.D. Ohio Aug. 23, 2004) (holding that it is appropriate to "declar[e] regression analysis inadmissible when it omits one or more major variables" (quoting Paul C. Giannelli and Edward J. Imwinkelried, Scientific Evidence 3rd, 719–20 (1999) ("The courts have been increasingly receptive to regression analysis. . . . However, the model's omission of any obviously influential variable or the absence of a major assumption of regression analysis often results in the inadmissibility of the evidence."))).  But as in *Marshfield Clinic*, Sattinger's analysis is rendered "worthless" because it failed to control for even the most fundamental differences among LNK, Baltimore, and St. Louis.  152 F.3d at 593.  Sattinger's analysis is ultimately "evidence [that] is not probative because it omitted the major variables," rendering it a "'regression[] so incomplete as to be inadmissible as irrelevant.'"  *Bickerstaff*, 196 F.3d at 449 (quoting *Bazemore*, 478 U.S. at 400 n.10).

Second, Sattinger's analysis failed to account for whether the comparison markets utilize exchange agreements.  An exchange agreement "is a contract between two [gasoline] refiners by which the two companies trade gasoline."  (D.N. 88, PageID # 1094)  As characterized by Marathon LP, the exchange agreements "involve a refiner or supplier agreeing to provide gasoline to a competing refiner for sale in a particular area where that competitor has insufficient supply." (D.N. 28-1, PageID # 219)  The use of exchange agreements is a particularly important variable here because the Commonwealth has identified Defendants' use of exchange agreements as one of the three main forms of anticompetitive conduct that allegedly harmed consumers.  (D.N. 88, PageID # 1097)  If wholesale buyers and sellers in the Baltimore and St. Louis markets also entered exchange agreements, then Sattinger's conclusion that the differences in price among the markets must be attributable to anticompetitive conduct is significantly undermined.  And Sattinger admitted at his deposition that it was possible that Baltimore and St. Louis market participants use exchange agreements because "[i]t is widespread practice in the oil industry."  (D.N. 191-4, PageID # 7921–22)

Finally, Sattinger failed to disaggregate the portion of his ultimate damages figure that could be attributable to any of the Defendants' *procompetitive* conduct.  To prevail on its antitrust claim, the Commonwealth must be able to show that Defendants' illegal conduct is the source of the alleged injury to consumers.  *See, e.g.*, *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988) (holding that antitrust plaintiff must link injury to defendant's anticompetitive conduct with economic analysis).  As noted by the Commonwealth, an antitrust expert is not required to attribute exact sums of damages to particular actions by the defendant. *See MCI Commc'n Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) (applying Supreme Court's determination that antitrust plaintiff need not disaggregate "damages among the

18

various unlawful acts of the defendant").  But an antitrust plaintiff must distinguish between "damages attributable to lawful competition and [those] attributable to the unlawful scheme." *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1985); *U.S. Football League*, 842 F.2d at 1378 (holding that "the damages awarded must be traced to some degree to unlawful acts" (citing *MCI Commc'n*, 708 F.2d at 1161)).  Sattinger's report fails because he did not specify what portion of the calculated damages figure stems from Defendants' legal conduct and what portion, if any, is caused by any of their allegedly illegal forms of conduct. Without establishing that illegal conduct by Defendants caused the claimed injuries, the Commonwealth cannot show proof of "injury of the type antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

In sum, the Court cannot find that the methodology Sattinger employed to arrive at his damages calculations was reliable or based upon sound scientific principles.  He admitted to failing to control for rudimentary differences among cities, but then claimed to calculate damages by comparing LNK to Baltimore and St. Louis.  The Court acknowledges that an expert is not required to control for every variable.  *See Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) ("In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury.").  Moreover, although Sattinger's rebuttal opinion attempted to control for the most salient differences between the comparison cities (D.N. 191-11, PageID # 8113), it still neglected to address or recalculate the original damages figure.  Sattinger's failure to calculate a reliable damages figure renders his opinion inadmissible.  *See In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 427 (S.D.N.Y. 2005) ("Where an expert conducts a regression analysis and fails to incorporate major independent variables, such analysis may be excluded as irrelevant.").  Further, Sattinger assumed that the differences in price were attributable to

19

anticompetitive conduct and did not eliminate any procompetitive explanation for his ultimate damages figure.  This shortcoming also renders his opinion inadmissible, because he cannot show that the Commonwealth's claimed injuries are "injur[ies] of the type the antitrust laws were intended to prevent and that flow[] from that which makes defendants' acts unlawful." *Brunswick Corp.*, 429 U.S. at 489.  Because Sattinger neither employed a scientifically reliable method to arrive at his proposed relevant market nor established an antitrust injury through reliable means, Defendants' motion to exclude Sattinger's testimony will be granted.  *Daubert*, 509 U.S. at 597 (holding that district court may only admit expert testimony that "both rests on a reliable foundation and is relevant to the task at hand").

## IV.

The Court will next consider Defendants' motion for summary judgment on the merits of the Commonwealth's antitrust claims.  (D.N. 195)

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see* 56(c)(1).  For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party.  *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  The Court "need consider only the cited materials," however.  Fed. R. Civ. P. 56(c)(3); *see Shreve v. Franklin Cty.*, 743 F.3d 126, 136 (6th Cir. 2014).  If the nonmoving party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the fact may be treated as undisputed.  Fed. R. Civ. P. 56(e)(2)-(3).  To survive a motion for summary judgment, the nonmoving party must establish a

genuine issue of material fact with respect to each element of each of its claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Summary judgment is often unsuited for fact-intensive antitrust cases, but the standard for summary judgment remains the same.  *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 481 (3d Cir. 1992).  Both the Sixth Circuit and the Supreme Court have found that summary judgment is appropriate where a party fails to establish the necessary components of an antitrust claim.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Ky. Speedway*, 588 F.3d at 915.  Specifically, "[a]ntitrust plaintiffs cannot survive motions for summary judgment without adequately alleging an antitrust injury."  *In re Se. Milk*, 739 F.3d at 284.  As stated above, an antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.*"  Brunswick Corp.*, 429 U.S. at 489.  Summary judgment is also appropriate when a court excludes the only expert testimony proposing a relevant market, since antitrust claims make "no economic sense" in the absence of "proof of relevant markets."  *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, No. CIV.A.05-138(WOB), 2008 WL 113987, at *2 (E.D. Ky. Jan. 7, 2008), *aff'd*, 588 F.3d 908.

As detailed above, Sattinger's report fails to establish a relevant market, calculates damages based on a flawed comparison, and makes no attempt to control for the impact of Defendants' procompetitive behavior as opposed to its alleged anticompetitive practices.  Sattinger is the Commonwealth's only expert witness who has submitted a report.  And the only other evidence of market definition or dominance offered by the Commonwealth is "lay testimony and internal [Marathon] documents," which are insufficient to establish a reliable geographic market.  *Ky. Speedway*, 588 F.3d at 919.  Without a properly defined relevant market, the Commonwealth

21

cannot establish that Marathon Petroleum Corporation and Marathon LP dominated the market for wholesale RFG; indeed, "[t]he purpose of defining a geographic market is to reveal whether, or to what extent, market power exists." *In re Se. Milk*, 739 F.3d at 262, 277.  Without an adequately defined relevant market, the Commonwealth cannot demonstrate either that Defendants unreasonably restrained trade in the market or that they exercised monopoly power in the market. Therefore, the Commonwealth's Sherman Act §§ 1 and 2 claims must fail. *See Verizon Commc'ns, Inc. v. Law Offices of Curtis Trinko, LLP*, 540 U.S. 398, 407 (2004) (holding that a claim under § 2 of the Sherman Act requires "the possession of monopoly power *in the relevant market*" (emphasis added)); *Worldwide Basketball & Sports Tours*, 388 F.3d at 959 (listing requisite elements of § 1 Sherman Act claim, including unreasonable restraint of trade "in the relevant market"); *see also NHL Players' Ass'n*, 325 F.3d at 719–20 ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim.").

Further, without evidence of an antitrust injury, the Commonwealth cannot establish that Defendants' alleged wrongdoing harmed consumers.  Sattinger admitted that it was possible that "other factors" besides Marathon's misconduct contributed to the differences in prices among St. Louis, Baltimore, and LNK.  (D.N. 191-4, PageID # 7947–48)  The Commonwealth has not presented any other evidence of a link between Marathon Petroleum Corporation, Marathon LP, or Speedway's allegedly anticompetitive conduct and antitrust injury.  It is the Commonwealth's burden to prove antitrust injury, *Worldwide Basketball & Sport Tours*, 388 F.3d at 962, and without Sattinger's testimony, no evidence remains to raise a material issue of fact as to causation. Summary judgment is therefore appropriate as to the Commonwealth's federal antitrust claims against all the defendants because there is no evidence of a "causal connection" between Defendants' conduct and the allegedly anticompetitive prices of Summer RFG in Louisville and

Northern Kentucky.  *See J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc*., 485 F.3d 880, 891 (6th Cir. 2007) (upholding grant of summary judgment based on failure to establish causal connection between the defendant's conduct and alleged antitrust injury); *see also Valley Prods., Inc. v. Landmark*, 128 F.3d 398, 403 (6th Cir. 1997) ("The Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation.").  And with the federal claims dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims, which will be dismissed without prejudice.  *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." (quoting *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996))); *see also* 28 U.S.C. § 1367(c)(3) (stating that a district court may decline to exercise supplemental jurisdiction if it has "dismissed all claims over which it ha[d] original jurisdiction").  Accordingly, and the Court being otherwise sufficiently advised, it is hereby

     **ORDERED** as follows:

     (1)     Marathon Petroleum Corporation's motion for summary judgment on personal jurisdiction (D.N. 156) is **DENIED**.

     (2)     Defendants' motion to exclude the testimony of Dr. Sattinger (D.N. 191) is **GRANTED**.

     (3)     Plaintiff's motion to exclude the testimony of Dr. Shehadeh and Dr. Baye (D.N. 190) is **DENIED** as moot.

23

(4)   Defendants' motion for summary judgment (D.N. 195) is **GRANTED** as to the Commonwealth's federal antitrust claims (Counts 1, 2, and 3).

(5)   Plaintiff's remaining state-law claims are **DISMISSED** without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

(6)   A separate judgment will be entered this date.

June 1, 2020

**David J. Hale, Judge**
**United States District Court**